## CHEROKEE NATION *v.* UNITED STATES

### APPEAL FROM THE COURT OF CLAIMS.

No. 198. Argued March 8, 1926.—Decided April 12, 1926.

1. The effect as *res judicata* of the judgment of the Court of Claims, as modified by this Court'(202 U. S. 101), determining the claims of the Cherokee Nation against the United States, was waived in so far as concerns interest, by the Act of March 3, 1919, directing a re-examination of that question and specially conferring jurisdiction on the Court of Claims, with a right of appeal to this Court. P. 486.
2. Congress has power to waive the benefit of *res judicata* by allowing another trial of a claim against the United States. *Id.*
3. Interest can not be recovered from the United States in a suit on contract referred by special Act to the Court of Claims, unless the contract or the special Act expressly authorized interest. P. 487.
4. On the amounts of principal owing them by the United States, as determined in the case reported in 202 U. S. 101, the Cherokees were entitled, as by stipulation, to simple interest only, at five per cent. to date of payment. P. 487.
5. The fact that Congress failed to appropriate money, in accordance with its agreement, to pay principal amounts and accrued simple interest due to the Cherokees on an account stated and agreed to between them and the United States, is not a good reason for allowing interest on the interest from the time when the payments should have been made. P. 488.
6. The provision in the sixth article of the agreement with the Cherokees, of December 19, 1891, ratified by Act of March 3, 1893, providing for interest at five per cent. on money to be paid them " so long as the money . . . shall remain in the Treasury," refers to money payable for the land ceded by the Indians under

the agreement, and not to the principal sums and interest to be accounted as due under past treaties and laws. P. 491.

7. The provisions in the Treaty of June 19, 1866, and Rev. Stats. § 3659 for investing Cherokee funds in United States stocks and paying interest are not a basis for compounding interest on the amount expended from such funds for removal of Eastern Cherokees to Indian Territory, since, by agreement of the Cherokees and the United States under a Senate Resolution of 1850 and through ratification of the account stated under the agreement of December 19, 1891, the interest was to be at five per cent. until the debt was paid. P. 491.

8. Under the judgment rendered by this Court in 1906, 202 U. S. 101, interest thereafter should not have been calculated on the interest included in the judgment but only on the principal amounts, until paid. Pp. 492, 495.

9. The provision of the Act of September 30, 1890, for paying interest at four per cent. on judgments appealed to this Court by the United States from the Court of Claims, from the date of filing the transcript of judgment in the Treasury Department to the date of the mandate of affirmance, does not apply to a judgment which itself provides for a certain rate of interest after its entry. P. 493.

59 Ct. Cls. 862, affirmed.

APPEAL from a judgment of the Court of Claims dismissing the petition in a suit by the Cherokee Nation.

*Mr. Frank K. Nebeker,* with whom *Messrs. Frank J. Boudinot, C. C. Calhoun, Wilfred Hearn,* and *Leslie C. Garnett* were on the brief, for appellant.

*Assistant Attorney General Galloway,* with whom *Solicitor General Mitchell* was on the brief, for the United States.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

In 1906, this Court affirmed a judgment of the Court of Claims for the principal of and the interest on four amounts due from the United States to the Cherokee

Nation. *Cherokee Nation* v. *United States*, 202 U. S. 101; s. c. 40 Ct. Cls. 252. The interest allowed in the judgment was five per cent. on the four claims from the accruing of liability to their payment. Since that judgment, and its payment in full, the Cherokee Nation has presented to Congress the claim, that more than simple interest was due, that the principal and interest due in 1895 should have been regarded as a lump sum, and that, thereafter, interest on the total at five per cent. to the time of payment should have been allowed. This, if granted, would be an additional sum of $2,216,091.76, with five per cent. interest from the dates of previous credits till paid. A special Act of Congress, of March 3, 1919, 40 Stat. 1316, c. 113, provides in part as follows:

" That jurisdiction is hereby conferred upon the Court of Claims to hear, consider, and determine the claim of the Cherokee Nation against the United States for interest, in addition to all other interest heretofore allowed and paid, alleged to be owing from the United States to the Cherokee Nation on the funds arising from the judgment of the Court of Claims of May eighteenth, nineteen hundred and five (Fortieth Court of Claims Reports, page two hundred and fifty-two) in favor of the Cherokee Nation. The said court is authorized, empowered, and directed to carefully examine all laws, treaties, or agreements, and especially the agreement between the United States and the Cherokee Nation of December nineteenth, eighteen hundred and ninety-one, ratified by the United States, March third, eighteen hundred and ninety-three (Twenty-seventh Statutes at Large, page six hundred and forty; section ten), in any manner affecting or relating to the question of interest on said funds, as the same shall be brought to the attention of the court by the Cherokee Nation under this act. And if it shall be found that under any of the said treaties, laws, or agreements interest on one or more of the said funds, either in whole or in part,

has not been paid and is rightfully owing from the United States to the Cherokee Nation, the court shall render final judgment therefor against the United States and in favor of the Cherokee Nation, either party to have the right to appeal to the Supreme Court of the United States as in other cases."

It is not necessary to recount the long and intricate history of the relations between the United States and the Cherokee Nation. It is complicated by the division between Cherokees into the Eastern Cherokees, who wished to become civilized and remain in the States east of the Mississippi, and those who preferred nomadic and hunting life in the West, and who first went to the Indian Territory and were called the Old Settlers. Ultimately the Eastern Cherokees were removed to the same place, and they and the Old Settlers were united in a common government again by the Treaty of 1846, 9 Stat. 871. The sale and purchase and transfer of lands east and west of the Mississippi, the distribution of these, the cost of removal of the various bands of the Nation to Indian Territory, and other transactions involving expense, were the subject of discussion and dispute between the Government and the Nation and its different bands. In avowed conformity with the Treaty of 1846, Congress appropriated, in 1852, the sum of $724,603, " in full satisfaction and final settlement of all claims and demands whatsoever of the Cherokee Nation against the United States." 9 Stat. 573, c. 12. A full and final discharge was accordingly signed by the representatives of the Cherokee Nation, but under protest. Other claims, however, were thereafter made and paid, one of nearly $190,000 to the Old Settlers. Then, in a case of *The Old Settlers* v. *United States,* 27 Ct. Cls. 1, affirmed by this Court in 148 U. S. 427, a judgment for $212,376.94, with interest from 1838 and an additional $4,100 was given them.

In 1889, the United States desired to buy from the Cherokees what was known as the Cherokee Outlet, in Oklahoma, embracing 8,000,000 acres, for settlement as public land.   Under the authority of § 14 of the Act of March 2, 1889, 25 Stat. 1005, an agreement was made December 19, 1891, by the United States with the Cherokee Nation, by the first article of which the Cherokee Nation agreed to convey to the United States, 8;144,682.91 acres between the 96th and 100th degrees of west longitude, south of the Kansas line, and commonly known as the " Cherokee outlet."

The fourth article of the agreement was as follows:

"Fourth.   The United States shall, without delay, render to the Cherokee Nation, through any agent appointed by authority of the national council, a complete account of moneys due the Cherokee Nation under any of the treaties ratified in the years 1817, 1819, 1825, 1828, 1833, 1835, 1836, 1846, 1866, and 1868, and any laws passed by Congress of the United States for the purpose of carrying said treaties, or any of them, into effect; and upon such accounting should the Cherokee Nation, by its national council, conclude and determine that such accounting is incorrect or unjust, then the Cherokee Nation shall have the right within twelve (12) months to enter suit against the United States in the Court of Claims, with the right of appeal to the Supreme Court of the United States by either party, for any alleged or declared amount of money promised but withheld by the United States from the Cherokee Nation, under any of said treaties or laws, which may be claimed to be omitted from or improperly or unjustly or illegally adjusted in said accounting; and the Congress of the United States shall at its next session, after such case shall be finally decided and certified to Congress according to law, appropriate a sufficient sum of money to pay such judgment to the Cherokee Nation, should judgment be rendered in her

favor; or, if it shall be found upon such accounting that
any sum of money has been so withheld, the amount shall
be duly appropriated by Congress, payable to the Chero-
kee Nation upon the order of its national council, such
appropriation to be made by Congress if then in session,
and if not, then at the session immediately following such
accounting."

The Sixth Article was in part as follows:

"Sixth. That in addition to the foregoing enumerated
considerations for the cession and relinquishment of title
to the lands hereinbefore provided the United States shall
pay to the Cherokee Nation, at such time and in such
manner as the Cherokee National Council shall determine,
the sum of eight million five hundred and ninety-five
thousand seven hundred and thirty-six and twelve one-
hundredths ($8,595,736.12) dollars in excess of the sum
of seven hundred and twenty-eight thousand three hun-
dred and eighty-nine and forty-six one-hundredths ($728,-
389.46) dollars, the aggregate of amounts heretofore ap-
propriated by Congress and charged against the lands of
the Cherokees west of the Arkansas River, and also in
excess of the amount heretofore paid by the Osage Indians
for their reservation. So long as the money or any part
of it shall remain in the Treasury of the United States
after this agreement shall have become effective, such
sum so left in the Treasury of the United States shall
bear interest at the rate of five per centum per annum,
payable semi-annually: Provided, That the United States
may at any time pay to said Cherokee Nation the whole
or any part of said sum and thereupon terminate the
obligation of the United States in respect to so much
thereof as shall be so paid and in respect to any further
interest upon the same."

On January 4, 1892, the agreement of 1891 was ap-
proved by the Cherokee National Council. The agree-
ment was ratified by Congress by § 10 of the Act of March

3, 1893, 27 Stat. 612, 640, which appropriated $295,736, to be immediately available and the remaining sum of $8,300,000, it was provided, should be " payable in five equal installments, commencing on the fourth day of March, eighteen hundred and ninety-five, and ending on the fourth day of March, eighteen hundred and ninety-nine, said deferred payments to bear interest at the rate of four per centum per annum, to be paid annually."

The Act further provided that the acceptance by the Cherokee Nation of Indians of any of the money appropriated as therein set forth should be considered and taken, and should operate, as a full and complete relinquishment and extinguishment of all the title, claim, and interest in and to said lands of the Cherokee Nation.

The sum of $5,000 was appropriated by the Act to enable the Commissioner of Indian Affairs, under the direction of the Secretary of the Interior, " to employ such expert person or persons to properly render a complete account to the Cherokee Nation of moneys due said Nation, as required in the fourth subdivision of Article II of said agreement."

On May 17, 1893, a deed of cession was executed and delivered by the proper authorities of the Cherokee Nation to the United States and the first installment of the purchase money was paid to and accepted by the Cherokee Nation; and the United States thereupon took possession of said lands, and thereafter disposed of the same. The other installments were duly and seasonably paid.

In pursuance of the Act of March 3, 1893, *supra*, the Secretary of the Interior promptly employed two expert accountants, Messrs. James A. Slade and Joseph T. Bender, to prepare an account between the United States and the Cherokee Nation, and, on April 28, 1894, they filed it with the Secretary. The amounts due the Cherokee Nation were summed up as follows:

" Under the treaty of 1819:

  " Value of three tracts of land containing 1700
      acres at $1.25 per acre, to be added to the
      principal of the ' school ' fund.............     $2, 125. 00
          (With interest from Feb. 27, 1819, to date
      of payment.)

" Under treaty of 1835:

  Amount paid for removal of Eastern Cherokees
      to the Indian Territory, improperly charged
      to treaty fund..........................     $1, 111, 284. 70
          (With interest from June 12, 1838, to date
      of payment.)

" Under treaty of 1866:

  Amount received by receiver of public moneys
      at Independence, Kans., never credited to
      Cherokee Nation.........................        $432. 28
          (With interest from Jan. 1, 1874, to date
      of payment.)

" Under act of Congress March 3, 1893:

  Interest on $15,000 of Choctaw funds applied
      in 1863 to relief of indigent Cherokees, said
      interest being improperly charged to Cherokee
      national fund............................      $20, 406. 25
          (With interest from July 1, 1893, to date
      of restoration of the principal of the Cherokee
      funds, held in trust in lieu of investments.)"

This was transmitted by the Secretary of the Interior
to the proper authorities of the Cherokee Nation, and it
was accepted by Act of the National Council approved
December 1, 1894. It was then transmitted by the Secre-
tary to Congress, on January 7, 1895. The principal
due on said account on March 4, 1895, was $1,134,248.23,
and the interest was $3,162,279.34.

Instead of making an appropriation for this amount,
Congress on March 2, 1895, referred the report of the
Secretary of the Interior to the Attorney General, and
authorized and directed him to review the conclusions of
law reached by the Department of the Interior in the
account and report his conclusions at the next regular

session. 28 Stat. 795, c. 177. The Attorney General made his report, December 2, 1895, which differed with the report of the Secretary of the Interior and the Slade and Bender report, holding that, under the Treaty of 1846 and the settlement of 1852 by appropriation of Congress, the Cherokees were properly charged with the expense of removal, and that the item 2 of $1,111,284.70 in the report was improperly charged to the United States. No action was taken in settlement of the matter by Congress until July 1, 1902, when, by § 68 of the Act of July 1, 1902, 32 Stat. 726, it referred the claims to the Court of Claims, as follows:

" Jurisdiction is hereby conferred upon the Court of Claims to examine, consider, and adjudicate, with the right of appeal to the Supreme Court of the United States by any party in interest feeling aggrieved at the decision of the Court of Claims, any claim which the Cherokee Tribe, or any band thereof, arising under treaty stipulations, may have against the United States, upon which suit shall be instituted within two years after the approval of this act; and also to examine, consider, and adjudicate any claim which the United States may have against the said tribe, or any band thereof. . . ."

Under this Act, the Cherokee Nation brought suit against the United States, claiming the whole amount with interest, found due by the Slade and Bender account. Thereafter the Eastern Cherokees and the Eastern and Emigrant Cherokees each brought suit under the Act of July 1, 1902, as amended by the Act of March 3, 1903, against the United States, each claiming the removal fund of $1,111,284.70. The three suits were consolidated by order of the court, and were heard, considered, and decided together. The decree of the Court of Claims, in conformity with its opinion and conclusion of law entered March 20, 1905, was in part as follows:

"It is, this 18th day of May, A. D. 1905, adjudged, ordered, and decreed that the plaintiff, the Cherokee Nation, do have and recover of and from the United States as follows:

Item 1: The sum of.............................     $2,125.00
    With interest thereon at the rate of 5 per cent.
    from Feb, 27, 1819, to date of payment.
Item 2: The sum of............................  $1,111,284.70
    With interest thereon at the rate of 5 per cent.
    from June 12, 1838, to date of payment.
Item 3: The sum of............................       $432.28
    With interest thereon at the rate of 5 per cent.
    from Jan. 1, 1874, to date of payment.
Item 4: The sum of............................    $20,406.25
    With interest thereon from July 1, 1893, to date of
    payment."

Then followed directions as to the payment and distribution of the different items of the judgment. 40 Ct. Cls. 252, 363, 364.

The case having come to this Court on appeal, the judgment was affirmed, on April 30, 1906, with a modification, consisting of a direction that item two, $1,111,284.70, with interest at 5 per cent. from June 12, 1838, to date of payment, should be distributed among 'the Eastern Cherokees as individuals, whether east or west of the Mississippi, parties to the treaties of 1835–36 and 1846, and exclusive of Old Settlers.' 202 U. S. 101, 130, 131. On May 28, 1906, the Court of Claims entered a decree modifying its original decree to conform to the mandate of the Supreme Court. In attempted satisfaction of the judgment of the Court of Claims, as modified by the Supreme Court, and as directed by subsequent appropriation acts, there has been paid to the Cherokee Nation the sum of $5,158,005.54.

The Court of Claims held in the case before us, that the plaintiff was not entitled to recover any more interest, and its petition was dismissed. Hence this appeal.

The first question for our consideration is the effect of the Act of 1919 in referring the issue in this case to the

Court of Claims. The judgment of this Court in the suit by the Cherokee Nation against the United States, in April, 1906 (202 U. S. 101), already referred to, awarded a large amount of interest. The question of interest was considered and decided, and it is quite clear that but for the special Act of 1919, above quoted, the question here mooted would have been foreclosed as *res judicata.* In passing the Act, Congress must have been well advised of this, and the only possible construction therefore to be put upon it is that Congress has therein expressed its desire, so far as the question of interest is concerned, to waive the effect of the judgment as *res judicata,* and to direct the Court of Claims to re-examine it and determine whether the interest therein allowed was all that should have been allowed, or whether it should be found to be as now claimed by the Cherokee Nation. The Solicitor General, representing the Government, properly concedes this to be the correct view. The power of Congress to waive such an adjudication of course is clear. See *Nock* v. *United States,* 2 Ct. Cls. 451; *Braden* v. *United States,* 16 Ct. Cls. 389, and *United States* v. *Grant,* 110 U. S. 225. Compare *United States* v. *Realty Company,* 163 U. S. 427; *Allen* v. *Smith,* 173 U. S. 389, 393, 402; *United States* v. *Cook,* 257 U. S. 523, 527; *Work* v. *United States ex rel. Rives,* 267 U. S. 175, 181; *Mitchell* v. *United States,* 267 U. S. 341, 346.

There is nothing before us which indicates that the present claim for a rest in the matter of interest in 1895, was presented either to the Court of Claims or to this Court. It is a new argument not before considered. The argument is that the consideration for the land to be conveyed under the agreement of 1891 was not only the eight and a half millions of dollars to be paid, but also the appropriation by Congress of money to pay the old accounts long due, and that the failure of Congress to make the appropriation at the time agreed required that interest

thereafter should be awarded upon the lump sum of principal and interest as of that date, in full payment of the purchase money for the land. The claim is that the failure of Congress to make the appropriation as stipulated in the contract became a new *terminus a quo* from which the calculation of interest on everything then due and owing must be calculated.

In taking up this argument, we should begin with the premise, well established by the authorities, that a recovery of interest against the United States is not authorized under a special Act referring to the Court of Claims a suit founded upon a contract with the United States unless the contract or the act expressly authorizes such interest. This is in accord with the general Congressional policy as shown in § 177 of the Judicial Code, providing that " no interest shall be allowed on any claim up to the time of the rendition of judgment thereon by the Court of Claims, unless upon a contract expressly stipulating for the payment of interest." *Tilson* v. *United States,* 100 U. S. 43, 46; *Harvey* v. *United States,* 113 U. S. 243, 249.

We have already held, in *The Old Settlers* case, *supra,* and in *United States* v. *The Cherokee Nation, supra,* that in the past financial dealings between the United States and the Cherokee Nation on debts due from the former to the latter, interest at five per cent. until payment was to be allowed as if stipulated. This result followed from a decision by the Senate of the United States acting as umpire between the two parties in 1850. In that capacity it adopted the following resolution:

" Resolved, That it is the sense of the Senate that interest at the rate of 5 per cent. per annum should be allowed upon the sums found to be due to the Eastern and Western Cherokees respectively, from the 12th day of June, 1838, until paid."

Thus it was that the accountants Slade and Bender reported that interest at five per cent. until paid should

be allowed the Cherokees, not only on the items which were due in 1850, but also on those which had accrued since; and, by the ratification of their report by both parties, interest thus calculated becomes a stipulated term in respect of the issue before us.

It is contended, however, by counsel for the Cherokee Nation, that the decision of this Court in 1906 so treats the breach of the contract by the Government in failing to make the appropriation in 1895 as to justify the claim that it was more than a mere continuance of the failure to pay,—that it was a new breach of a new contract, requiring interest as upon a new default in a new debt of the sum total of the original claim with interest added down to 1895.

We can not ascribe such an effect to the decision referred to. The chief controversy in that case was as to the liability of the Government at all for the removal expenses of the Eastern Cherokees. It was argued on its behalf, as the report of the case in the Court of Claims shows (40 Ct. Cls. 252, 307), that Slade and Bender were merely accountants employed by the Government to state the account and not to pass on the legal validity and effect of the Treaty of 1846 and the scope of the settlement evidenced by the appropriation and the signed releases of 1852; that the Cherokees were not bound by the report as an account stated or settled but were given full right by the agreement of 1891 to contest its correctness and to resort to court in respect of it; and that the Government could not be bound by such a report, in which the accountants exceeded their authority as mere accountants and exercised their functions as if authorized to act as arbitrators or umpires. This Court stated its adverse conclusion on this point by quoting and approving the language of Chief Justice Nott in the Court of Claims (202 U. S. 101 at pp. 122, 123) as follows:

" The court does not intend to imply that when the account of Slade and Bender came into the hands of the

Secretary of the Interior he was bound to transmit it to the Cherokee Nation. On the contrary, the Cherokee Nation had not agreed to be bound by the report of the accountants and could not claim that the United States should be. The accountants were but the instrumentality of the United States in making out an account. When it was placed in the Interior Department it was as much within the discretion of the Secretary to accept and adopt it or to remand it for alterations and corrections as a thing could be. He was the representative of the United States under whom the agreement had been made, and he was the authority under which the account had been made out, and when he transmitted it to the Cherokee Nation his transmission was the transmission of the United States. When the account was thus received by the Cherokee Nation (May 21, 1894), the 'twelve months' of the agreement, within which the Nation must consider it and enter suit against the other party in the Court of Claims, began to run, and with the Nation's acceptance of the account (December 1, 1894), the session of Congress at which an appropriation should be made became fixed and certain. The Secretary did not recall the account; the United States never rendered another, and the utmost authority which Congress could have exercised, if any, was, at the same session, or certainly within the prescribed 'twelve months,' to have directed the Secretary to withdraw the account and notify the Cherokee Nation that another would be rendered. The action of the Secretary of the Interior, combined with the inaction of Congress to dire anything to the contrary, makes this provision of the agreement final and conclusive. The Cherokee Nation has parted with the land, has lost the time within which it might have appealed to the courts, and has lost the right to bring the items which it regards as incorrectly or unjustly disallowed to judicial arbitrament, and the United States are placed in the position of having broken and evaded the letter and spirit of their agreement."

All this, however, was directed to the question of the liability of the United States to pay the principal debt. The Court then proceeded to find the interest due as directed in the Slade and Bender account without any suggestion of a rest for interest in 1895, or anything other than simple interest at five per cent. until paid.

When we consider the rule requiring an express provision of contract or statute to justify the imposition of interest in adjudicating any claim against the United States, we can find nothing in the circumstances of this case to increase the interest as adjudged. The additional interest now claimed is sought really as damages for the delay of Congress in appropriating the sum due in 1895 as the United States promised in the 1891 agreement. But the rule as to interest against the United States does not allow us to adjudge interest as damages at all. Congress must expressly provide for it or the contract must so provide. The only contractual obligation here is for simple five per cent. interest until payment.

What the appellant here seeks is compound interest, that is interest on interest from 1895 until now. The general rule even as between private persons is that in the absence of a contract therefor or some statute, compound interest is not allowed to be computed upon a debt. *Whitcomb* v. *Harris,* 90 Me. 206; *Bradley* v. *Merrill,* 91 Me. 340; *Ellis* v. *Sullivan,* 241 Mass. 60, 64; *Tisbury* v. *Vineyard Haven Water Company;* 193 Mass. 196; *Lewin* v. *Folsom,* 171 Mass. 188, 192; *Wallace* v. *Glaser,* 82 Mich. 190; *Blanchard* v. *Dominion National Bank,* 130 Va. 633, 637; *Finger* v. *McCaughey,* 114 Cal. 64, 66; *Cullen* v. *Whitham,* 33 Wash. 366, 368. In view of the care with which Congress, and this Court in interpretation of the legislative will, have limited the collection of simple interest against the Government, *a fortiori* must compound interest be denied to appellant unless provision therefor is made in the contract of 1891, or in the statute.

of 1919 authorizing this suit,· and it is to be found in neither.

Further support for the claim of the appellant is said to be found in the sixth article of the agreement, quoted above, in the language, " so long as the money or any part of it shall remain in the Treasury of the United States after this agreement shall have become effective, such sums so left in the Treasury of the United States shall bear interest at rate of 5 per cent. per annum, payable semi-annually." It is said that this should be construed to refer not only to the balance unpaid of the $8,595,736.12, · but also to the money on the old claims found to be due under the agreement, because payment of the latter was part of the consideration for the land: A careful examination of the sixth article shows that this clause referred only to the new money consideration to be paid, and really only to the part of that which, after it fell due and was ready for payment, should be voluntarily left in the Treasury by the Cherokee Nation. It did not even refer to the originally deferred payments, because those payments were to bear only four per cent. interest. In any view, it did not and could not refer to amounts due on past account, because at the time the agreement of 1891 was made they were not fixed in amount and awaited a possible adjudication to determine them, and full treatment of them was given in article 4 of the agreement. The sixth article did not apply to them at all. ·

It is further argued that the payment of compound interest is to be supported here under the provisions of the Treaty of June 19, 1866, 14 Stat. 799, 805, which reads as follows:

" All funds now due the Nation, or that may hereafter accrue from the sale of their lands by the United States as hereinbefore provided for, shall be invested in United States registered stocks at their current value, and the interest on all such funds shall be paid semi-annually on the order of the Cherokee Nation."

And by § 3659 of the Revised Statutes, re-enacting § 2 of the Act of Congress of September 11, 1841, 5 Stat. 465, which provides:

" All funds held in trust by the United States, and the annual interest accruing thereon, when not otherwise required by treaty, shall be invested in stocks of the United States, bearing a rate of interest not less than five per centum per annum."

It is urged that the largest item, of $1,111,284.70, was taken out of a $5,000,000 trust fund held by the United States for the benefit of the Cherokees, and therefore that it should be treated as if it were always in the Treasury of the United States, held in trust for the Indians, and as if the United States had collected the interest thereon out of the invested stocks and had refused to pay it over as annuities to the Indians. This claim proves too much. It would require compound interest brought about by annual or semi-annual rests for near a century, an amount that the Solicitor General suggests would be equal to the National debt. The argument is shown to be wholly without support in the circumstance that the Cherokees and the United States, by the resolution of the Senate in 1850, agreed upon the interest for such debts as that of five per cent. until paid. Moreover, the ratification by the Cherokees of the Slade and Bender Report foreclosed any such claim.

After the judgment was rendered, in 1906, by this Court affirming that of the Court of Claims, the Treasury had some difficulty in deciding how the interest was to be calculated on the amounts declared in the judgment. We have no doubt that the judgment should have been paid in accordance with its exact terms, namely with simple interest down to the time of actual payment, and that the intervention of the judgment of 1906 made no difference in the calculation of the interest. This is the necessary effect of the judgment.

The Treasury was troubled by the provision of September 30, 1890, 26 Stat. 504, 537, which provides as follows:

"That hereafter it shall be the duty of the Secretary of the Treasury to certify to Congress for appropriation only such judgments of the Court of Claims as are. not to be appealed, or such appealed cases as shall have been decided by the Supreme Court to be due and payable. And on judgments in favor of claimants which have been appealed by the United States and affirmed by the Supreme Court, interest, at the rate of four per centum, shall be allowed and paid from the date of filing the transcript of judgment in the Treasury Department up to and including the date of the mandate of affirmance by the Supreme Court: Provided, That in no case shall interest be allowed after the term of the Supreme Court at which said judgment was affirmed."

It is quite clear that the statute applies where judgments against the United States bear no interest, and certainly not to one in which the judgment itself provides for a certain rate of interest after its entry. The above statute was framed in order to impose a penalty on the United States for its unsuccessful effort by appeal to defeat the judgment against it. It only allows interest pending the appeal from the date of filing the transcript in the Treasury Department to the date of the mandate of affirmance. The Treasury Department seems to have applied this statute with respect to all the four items of the judgment of 1906.

By the Act of June 30, 1906, 34 Stat. 634, 664, Congress made appropriation for the payment of the judgment of the Court of Claims, principal and interest, as follows:

"To pay the judgment rendered by the Court of Claims on May eighteenth, nineteen hundred and five, in consolidated causes numbered twenty-three thousand one hundred and ninety-nine, The Cherokee Nation versus

The United States; numbered twenty-three thousand two hundred and fourteen, The Eastern Cherokees versus The United States; and numbered twenty-three thousand two hundred and twelve, The Eastern and Emigrant Cherokees versus The United States, aggregating a principal sum of one million one hundred and thirty-four thousand two hundred and forty-eight dollars and twenty-three cents, as therein set forth, with interest upon the several items of judgment at five per centum, one million one hundred and thirty-four thousand two hundred and forty-eight dollars and twenty-three cents, together with such additional sum as may be necessary to pay interest, as authorized by law."

This Act was further amended by the Act of March 4, 1909, 35 Stat. 907, 938, 939, as follows:

" That the general deficiency appropriation act of June thirtieth, nineteen hundred and six, so far as the same provides for the payment of item two of the judgment of the Court of Claims of May eighteenth, nineteen hundred and five, in favor of the Eastern Cherokees, shall be construed as to carry interest on said item two up to such time as the roll of the individual beneficiaries entitled to share in said judgment shall be finally approved by the Court of Claims, and for the payment of said interest a sufficient sum is hereby appropriated."

Then by § 18 of the Act of June 30, 1919, 41 Stat. 3, 21, Congress provided for the payment of certain interest on items 1 and 4 of the judgment. The provision in this section as to item 1 seems to have been largely an overpayment. That as to item 4 seems also to have involved a considerable overpayment, though it also included ten years' interest due on the principal under the judgment which by the Government's error was not embraced in the payment under the Act of 1906.

The sum of all payments actually made under the judgment of 1905 was as follows:

| | |
|---|---:|
| On July 2, 1906, to the Secretary of the Interior on account of said item 1......................... | $11,520.46 |
| On the same date on account of item 3............. | 1,140.49 |
| On the same date on account of item 4............. | 23,294.93 |
| On July 14, 1906, to the attorneys for the Eastern Cherokees and the Eastern Emigrant Cherokees, fees amounting to............................. | 740,555.42 |
| On Nov. 3, 1906, to the attorneys for the Cherokee Nation on account of item 2, fees amounting to... | 148,245.15 |
| On various dates after July 2, 1906, and before final distribution of the fund arising from item 2, to Guion Miller for fees and expenses the sum of.... | 103,749.74 |
| On and after Mar. 15, 1910, to Guion Miller for per capita distribution among the Cherokees entitled to share in the fund the sum of.................... | 4,105,810.77 |
| On or about Aug. 7, 1919, additional interest on item 4, pursuant to the act of June 30, 1919........... | 21,502.86 |
| On or about Aug. 7, 1919, to the Secretary of the Interior as additional interest on item 1, pursuant to the said act of June 30, 1919................. | 2,185.72 |

Making a total sum, principals and interest, of. $5,158,005.54

The delay in the payment of the largest item was due to the desire to comply with the ruling of the Court of Claims, concurred in by this Court, that the money of the large claim should be distributed to the individual members of the Eastern Cherokees according to rolls to be made up of those individuals. 40 Ct. Cls. 332, 202 U. S. 119, 130. This is what led to the amendment of 1909.

It is quite clear that the mistake made by the Treasury, and by Congress, too, in attempting to carry out the judgment of this Court, was in assuming, first, that 4 per cent. should be allowed on the total of all items and interest between the date of filing the transcript of the judgment in the Treasury Department and the date of the mandate of affirmance by the Supreme Court, as already pointed out. A further mistake was made in calculating interest at 5 per cent. after the date of affirmance by this Court on the total of the judgment and the interest until final

payment. It should have been confined to interest on the principal sums. The eighth finding of the Court of Claims shows in more or less detail how the interest was calculated. The methods adopted we have already criticised. The Solicitor General in his brief makes it evident that in the case of no one of the four items is the amount which has been actually paid less than that which should have been paid down to the day of payment, in accordance with the judgment, including the principal and 5 per cent. simple interest to the date of payment. There is no attempt on the part of the appellant to question the demonstration of this fact. The truth is that the errors in the calculation increased by a substantial sum the amounts which under the judgment should have been paid. As this was more favorable than it should have been to the Cherokees, they can not complain. On this appeal, under the Act of 1919, and in compliance with its requirement, we hold that there is no more interest due to the Cherokees beyond that which they have already received. The Government is not in a position, in view of the fact that the errors referred to have been embodied in legislation, and the overpayments have been made by direction of Congress, to seek to recover them back. Indeed it has not attempted to do so. The judgment of the Court of Claims is

*Affirmed.*