**UNITED STATES v. HOSSMANN.**

No. 10608.

Circuit Court of Appeals, Eighth Circuit.

July 14, 1936.

Randolph C. Shaw, Sp. Asst. to Atty. Gen. (L. A. Lawlor, Acting Director, Bureau of War Risk Litigation, of Washington, D. C., Fendall Marbury, Sp. Asst. to Atty. Gen., J. Gregory Bruce, Atty., Department of Justice, of Washington, D. C., and Maurice M. Milligan, U. S. Atty., of Kansas City, Mo., on the brief), for appellant.

Lawrence E. Goldman, of Kansas City, Mo. (Frank R. Daley, of Kansas City, Mo., on the brief), for appellee.

Before WOODROUGH and THOMAS, Circuit Judges, and DEWEY, District Judge.

DEWEY, District Judge.

This is a war risk insurance case. The trial from which the appeal is taken resulted in a verdict and judgment for the appellee, whom for convenience we will refer to as the plaintiff.

The assignments of error urged on this appeal are as follows:

(1) The court erred in sustaining plaintiff's motion to reinstate this cause of action over the exception of the defendant at the time.

(2) The court erred in overruling defendant's motion for a directed verdict in its favor at the close of all the testimony for the reason that the plaintiff failed to prove by a fair preponderance of the testimony that he became permanently and totally disabled while the contract of insurance herein sued upon was in force and effect over the exception of the defendant at the time.

Suit was instituted by the plaintiff on August 8, 1930, on a war risk insurance contract for $10,000, payable in the event of death or permanent and total disability. The policy was in force to May 31, 1920. The disabilities are alleged to have been: High explosive shell wounds of the right thigh, traumatic neurosis, poisoned gas, bronchial asthma, and heart trouble, resulting in total diasabilty prior to the lapse of the policy.

The plaintiff alleged that the necessary disagreement to confer jurisdiction resulted from a denial on July 14, 1930, by the Veterans Bureau to pay plaintiff's claim. On July 3, 1930, there became effective an Act of Congress (38 U.S.C.A. § 445) which, among other things, defined what was meant by the term "disagreement" as used in the war risk insurance legislation, as: "A denial of the claim by the Administrator of Veterans' Affairs or someone acting in his name on an appeal to the Administrator," and that the definition of "disagreement" shall apply to all suits now pending against the United States.

The disagreement here is alleged to have arisen from a denial of the claim by a letter from the United States Veterans Bureau, signed by H. H. Milks, chief, awards division. Finding that this letter was not sufficient to raise a disagreement under the statutes then prevailing, and which provided that a disagreement could exist only after an appeal and decision by the director, the trial court dismissed the case on October 17, 1934, in these words: "Wherefore, it is ordered and adjudged that the plaintiff take nothing by his petition in this cause, and that the above entitled cause be and the same is hereby dismissed at the cost of the plaintiff." Later and on January 28, 1935, the Congress passed a resolution known as H. J. Res. 112 (c. 1, 49 Stat. 1, 38 U.S.C.A. § 445c), providing as follows:

"Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That a denial of a claim for insurance by the Administrator of Veterans' Affairs or any employee or agency of the Veterans' Administration heretofore or hereafter designated therefor by the Administrator shall constitute a disagreement for the purposes of section 19 of the World War Veterans' Act, 1924, as amended (U.S.C.Supp. VII, title 38, sec. 445). This resolution is made effective as of July 3, 1930, and shall apply to all suits now pending against the United States under the provisions of section 19 of the World War Veterans' Act, 1924, as amended, and any suit which has been dismissed solely on the ground that a denial as described in this resolution did not constitute a disagreement as defined by section 19 may be reinstated within three months from the date of enactment of this resolution."

On March 18, 1935, the plaintiff filed a motion to reinstate the cause under and by virtue of the provisions of this resolution and said motion was on the 27th day of March, 1935, sustained by the court and the case reinstated, and thereafter the case was tried upon its merits. It is from the ruling of the court in reinstating this case that the first assignment of error is directed.

It is suggested that the Congress does not have the power to reinstate in any court any case in which a final judgment has been entered; that this was not within the scope of legislative power; that setting aside a judgment and reinstating a case in which it was interested is an exercise of the judicial power which the Constitution vests exclusively in the courts.

But power delegated by Congress to a court for adjudication and settlement of claims against the United States is not such as is vested by the Constitution. As said in Williams v. United States, 289 U. S. 553, 557, 53 S.Ct. 751, 760, 77 L.Ed. 1372:

"And since Congress, whenever it thinks proper; undoubtedly may, without infringing the Constitution, confer upon an executive officer or administrative board, or an *existing* or specially constituted court, or retain for itself, the power to hear and determine controversies respecting claims against the United States, it follows indubitably that such power, in whatever guise *or by whatever agency exercised*, is no part of the judicial power vested in the constitutional courts by the third article. That is to say, a power which may be devolved, at the will of Congress, upon any of the three departments, plainly is not within the doctrine of the separation and independent exercise of governmental powers contemplated by the tripartite distribution of such powers." (Italics ours.)

The power delegated to the District Courts to hear and determine controversies over war risk insurance policies is therefore analogous to the power delegated to the Court of Claims with reference to other claims against the United States. And it has been expressly held that although a case has been adjudicated by such Court of Claims, the Congress may waive the adjudication and authorize a rehearing. Cherokee Nation v. United States, 270 U.S. 476, 486, 46 S.Ct. 428, 70 L.Ed. 694.

Here the United States government was in a somewhat dual position with reference to the litigation. It was the defendant in the case, but it was also authorized through the proper instrumentality, to wit, the Congress, to say what claims might be presented as against the government and what might be the scope, limitations, and procedure with reference to the enforcement of any such claim in the courts of the United States. We know of no constitutional inhibition against Congress waiving its right to claim an adjudication and to confer upon the courts the right to again and in any method the Congress desired, as far as the procedure is concerned, to have the case heard upon its merits. This is indicated in Frederick v. United States, 294 U.S. 695, 55 S.Ct. 511, 79 L.Ed. 1233; Id. (C.C.A.) 76 F.(2d) 1009. We find no error in the reinstatement of the case by the court.

The second assignment of error raises a question as to the sufficiency of the evidence to sustain the verdict, that is, as to whether the plaintiff became totally and permanently disabled while his insurance was in force prior to May 31, 1920. The court instructed the jury that " 'total and permanent disability' as used in this contract, means that if by reason of some mental or physical disease—in this case there is no claim that the plaintiff is suffering or has been suffering from any mental disease,—it is impossible for one continuously to carry on any substantially gainful occupation, then that person is totally disabled. And if that disease or malady is of such nature as that it is reasonably certain to continue throughout the lifetime of the person afflicted with it and throughout his lifetime totally to disable him from carrying on any substantial gainful occupation, then he is not only totally disabled, but he is totally and permanently disabled."

The court's instructions were not excepted to, nor did either party request any instructions, so that the instructions as given became the law of the case. United States v. Nickle (C.C.A.) 70 F. (2d) 873, 878. In considering whether the evidence supports the verdict, the appellate court must assume as established all the facts that the evidence supporting plaintiff's claim reasonably tends to prove, together with all reasonable inferences fairly deducible from such facts. Gunning v.

Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L. Ed. 720.

The plaintiff testified that at the time he went into the military service on July 5, 1918, he lived in California, Mo., and was engaged in farming, that he was then twenty-six years of age and had finished in the country schools the Fifth reader. He was drafted July 5, 1918, and after a short time in training landed in England about September 1, 1918. He was immediately engaged in active service in the front, and shortly after his arrival was taken with flu, but as soon as he was able to move was started towards the front lines. He was under fire from the time of his arrival at the front, and, after some harrowing experiences going through shell fire and machine gun fire, he was sent with a guide to the rear for instructions. His companion was killed and after his return a high explosive shell rendered him unconscious. It was morning when he came to, then he crawled on his hands and knees to a dugout where he stayed all day. This was September 15th as we understand the record. He was then carried two miles to a town where the ambulance took him to a field station and he finally arrived at a base hospital. On April 19, 1919, he landed at Hoboken, N. J., and was in a hospital there, later being transferred to the base hospital at Fort Snelling, Minn. He was first operated on at Mobile Hospital No. 5 in France for injuries to his leg made by the exploding shell and a second operation was had at the base hospital at Fort Snelling, Minn. He was hospitalized until his discharge or or about the 4th day of February, 1920.

He walked on crutches until his discharge and since that time has walked with a cane. His leg is the same now as it was at the time of his discharge. It is numb and he has no control of his foot or ankle. The leg is weak and especially in the knee, the circulation is poor, and the foot gets cold very easily. That he judges ·when his foot is cold by the other one because it is numb and has no feeling in it. With the use of a cane he has been able to get around all these years and has worn a brace on his leg all the time. At the time of his discharge he was bothered with shortness of breath and wheezing as he would choke up and take coughing spells, and often he has to sit up at night in a chair for two or three hours. This will happen two or three nights in succession and when he has severe coughing spells he has hot sweats. His first attack of this was in 1919 near Bordeaux, France, and he has had it practically all the time since. There are times when it will clear up for a few days, possibly as much as two weeks. It is irregular, just depends when it hits him. When he has these attacks, he must remain at home, sometimes in bed and sometimes in a chair. About one-fourth of the time since February 5, 1920, he has not been able to be around much. When he has these attacks, he is very nervous and any sudden shock or noise causes him to get nervous, and at those times his heart bothers him some. A sudden noise or explosion or noise of that kind bothers him and he has had this condition since he went to the hospital up to the present time.

This evidence is corroborated by his wife and other persons who knew him and by a Dr. Pokejoy, a resident of the home town of the plaintiff. He first examined the plaintiff on May 22, 1922, and diagnosed his trouble as asthma, and knows about his asthmatic trouble, his wheezing and coughing and nervousness. He has seen him as often as once a month since that time, and that the asthmatic condition and irritable heart have increased in severity; that his leg is numb and has not much feeling about it, he wears a brace, and his ankle is stiff and somewhat wasted away; that the condition of the leg, as well as the heart, asthma, and nervousness are permanent and incurable.

Like testimony was given by Dr. Ashley M. Gray, also of California, Mo., who has treated him since May, 1920.

His wife, in addition to corroborating the foregoing testimony, also says that he has trouble in sleeping and ofter jumps and screams and groans in his sleep and that he frequently sleeps in a chair. He was married soon after his return to the woman he was engaged to before he went into the service. That he very frequently hollers out and frequently screams in his sleep saying something about the war, that he seems to be living over again the horrors of the war, and has been the same ever since his discharge up to the present time.

### Industrial History.

Some time after his discharge from the service the plaintiff contracted a paint job which took nine or ten days. He mixed

some paint and watched the ladder. He was never a painter and this was the only paint job he was ever interested in. Since 1923, he has been janitor of the First Baptist Church of his home town. His duties are to keep the building clean, fire the furnace during the winter season, and to open and close the church for the two regular meetings, Wednesday and Sunday. The rest of the time the church is closed. His wife has assisted him in this work and he has had help all along in mowing the lawn and building the fires. His wife does the cleaning. He opens and closes the windows and occasionally runs a vacuum cleaner. This work takes about a day out of the week. The salary paid to him and his wife has run from $20 to $35 per month and about two-fifths of this money is paid out to others for this work. Rev. W. B. McGraw, pastor of the church, testified that the plaintiff has been helped by his wife and by different men in firing the furnace and mowing the yard; that the church was influenced in keeping him through sympathy and that the work was only part time as he could not perform all the duties himself, but with assistance he was able to hold the job because of the sympathetic attitude of the church toward him; that he tires very easily after any sort of activity and is very easily irritated and very restless. He was secretary of the congregation for a while, his duty was to take charge of the offering and deposits of the money, but he had nothing to do with the regular records. The plaintiff owned his home, but all work connected with the upkeep of the home, including the work in the garden, mowing of the lawn, etc., was done by men who were hired to do that work for him. This is the entire extent of plaintiff's industrial history.

Dr. Snider, testifying for the defendant, made an examination of the petitioner on March 9, 1931, and did not at that time find any evidence of asthma although he was given a history by the complainant of frequent attacks of asthma, shortness of breath, fast heart, nervousness, and pains in the hip and knee. There is in the report of the doctor also a diagnosis of "tachycardia, moderate—probably due to myocardial irritability."

With reference to the leg injuries, the orthopedist noted that the disability was permanent and severe. Plaintiff exhibited his injuries to the jury and in argument it was represented to the court that when plaintiff attempted to walk it was only by a swinging motion of the left leg, also exhibited to the jury.

Plaintiff was offered vocational training in agriculture, which was refused by him as he claimed his physical condition was such that it would not permit him to go away from home to take it up at that time. This was in May, 1920.

There is a doubt whether the assignment of error above set out raises the question as to the sufficiency of the evidence to warrant the submission of the case to a jury. However, so considering it, we are of the opinion that the case was properly so submitted. There are many cases on the question, but we are satisfied that this case is ruled by United States v. Nickle (C.C.A.) 70 F.(2d) 873, and United States v. Phillips (C.C.A.8) 44 F.(2d) 689.

The permanency of the disability is unquestioned. The jury might properly infer from the work record that the janitor job was the extent of plaintiff's ability to work at a gainful occupation and that he could not do this work without substantial assistance, and that the occupation considering the cost of assistance was not gainful.

The evidence of plaintiff as to his total disability is corroborated by medical testimony from an examination made prior to the time the insurance policy lapsed. Although plaintiff owned his home, he had not even cut the grass and, in addition to the aid of his wife, two-fifths of his small wages had to be given to others to help him in his work at the church. "The mere fact that one has done some work after the lapse of his policy is not of itself sufficient to defeat his claim of total permanent disability." Lumbra v. United States, 290 U.S. 551, 54 S.Ct. 272, 276, 78 L.Ed. 492.

The court fairly submitted the question of fact to the jury and we find no error in his having done so.

Affirmed.