# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3915

_____

| | | |
|---|---|---|
| American Milling Company; UN Limited; HB Marine, Inc., corporations; American Milling LP, a limited partnership, For Exoneration From, or Limitation of, liability, | * * * * * * | |
| Plaintiffs/Appellants, | * * * | Appeal from the United States District Court for the Eastern District of Missouri. |
| v. | * * | |
| Brennan Marine, Incorporated; Pinnacle Barge Co., LLP; Pinnacle Transportation, Inc.; Trustee of the Distribution Trust, formerly known as President Casino, Inc., | * * * * * * | |
| Claimants/Appellees. | * | |

_____

Submitted: January 14, 2010
Filed: October 22, 2010

_____

Before MELLOY, SMITH, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

This appeal is one of several stemming from an allision between one or more barges and a casino boat on the Mississippi River. The barges broke loose from a

towboat belonging to American Milling Co., UN Ltd., HB Marine, Inc., and American Milling LP (collectively, "American Milling") and damaged The Admiral, a moored casino entertainment ship owned by President Casino, Inc. ("President Casino").

This court previously addressed the parties' liability from the incident, American Milling's right to limit its liability, and the value of the limitation fund. *In re American Milling Co.*, 409 F.3d 1005 (8th Cir. 2005). This appeal involves an interpretation of Supplemental Rule for Admiralty or Maritime Claims F(1) ("Rule F(1)"). This rule outlines the procedure for posting security on a limitation fund and specifies the interest to be paid. Pursuant to Rule F(1), the district court[1] ordered American Milling to pay interest on its security at a rate of six percent compounded annually, and denied American Milling's motion to deposit the cash value of the security into the court registry at a later stage of the proceedings. We affirm.

I.

On April 4, 1998, the towboat M/V Anne Holly was traveling upstream on the Mississippi River when its tow of barges allided with the Eads Bridge near St. Louis, Missouri, and broke apart. One or more of the loosed barges allided with and damaged The Admiral, which was moored at the Missouri shore just downstream from the Eads Bridge. Two days later, American Milling filed a complaint in the district court seeking to limit its liability to the value of its vessel, pursuant to the Limitation of Shipowners' Liability Act of 1851 (the "Limitation Act"), 46 U.S.C. app. § 183 (current version at 46 U.S.C. § 30505). In accordance with Rule F(1), American Milling also submitted security to establish a limitation fund in the amount of $1.25 million, which the company claimed to be the fair market value of the M/V Anne Holly. President Casino, along with the barge claimants Brennan Marine, Inc.,

---

[1]The Honorable Stephen N. Limbaugh, Sr., United States District Judge for the Eastern District of Missouri, now retired.

Pinnacle Barge Co., and Pinnacle Transportation, Inc., filed claims against American Milling to recover damages.

After American Milling sold the vessel for $2.2 million ten months after the allision, the district court ruled in January 2001 that the fair market value of the M/V Anne Holly, and hence the value of the limitation fund, was $2.2 million, not $1.25 million. *In re American Milling Co.*, 125 F. Supp. 2d 981 (E.D. Mo. 2001). The court then directed American Milling "to establish the limitation fund by posting either a corporate surety bond in the amount of $2.2 million, or depositing cash into the court registry in the total amount of $2.2 million." *Id.* at 987. American Milling elected to post a bond.

In June 2003, following a trial, the district court determined that American Milling was eighty percent at fault for the allision, and attributed the remaining twenty percent of fault to President Casino. *In re American Milling Co.*, 270 F. Supp. 2d 1068 (E.D. Mo. 2003). The court also concluded that American Milling was entitled to limit its liability under the Limitation Act to the $2.2 million value of the M/V Anne Holly. *Id.* This court affirmed those determinations in May 2005, and remanded the case for further proceedings regarding damages. *In re American Milling Co.*, 409 F.3d at 1022.

American Milling moved on remand to deposit the cash value of the limitation fund, along with the simple interest accrued on its security since April 6, 1998, into the registry of the district court. The court initially granted the motion, on the mistaken impression that the request was unopposed, but President Casino filed a motion to set aside the court's order. President Casino's position was that interest on the fund should be compounded annually, and that American Milling should be required to maintain the surety bond throughout the proceedings.

President Casino invoked principles of equity to urge that the security should be maintained in the form most beneficial to the claimants, which in this case was the bond, and that interest should be compounded annually. American Milling opposed the motion to set aside, contending that the "per annum" language of Rule F(1) permitted only simple interest. The company also asserted that because depositing funds with the court is a permissible means of offering security for a limitation fund under Rule F(1), the court could not require American Milling to maintain a bond at the above-market, six percent interest rate specified in the rule. The district court granted the claimants' motion, vacated its order of May 2, 2006, and ordered that the six percent interest on the surety bond be compounded annually.

## II.

American Milling first challenges the district court's interpretation of the "per annum" language of Rule F(1) to permit compound interest on the security for the limitation fund. Rule F(1) is part of the Federal Rules of Civil Procedure, and we review the district court's interpretation of the rule *de novo*. *See Burns v. Lawther*, 53 F.3d 1237, 1240 (11th Cir. 1995).

As other courts have explained, "Rule F evolved as a procedural device to implement the [Limitation Act]." *Bouchard Transp. Co. v. Updegraff*, 147 F.3d 1344, 1347 (11th Cir. 1998). Congress passed the Limitation Act to limit the liability of shipowners to the post-accident value of the vessel at issue and any pending freight. "The apparent purpose of the Act was to encourage shipbuilding in this country and to place the U.S. shipping industry on equal footing with foreign competitors," who were protected against claims under European maritime codes. *Magnolia Marine Transp. Co. v. Oklahoma*, 366 F.3d 1153, 1155 (10th Cir. 2004) (citing 2 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 15-1, at 137 (2d ed. 1994)). The statute, however, did not establish a procedure to implement the limitations on liability that it established. In 1872, the Supreme Court enacted rules to establish a uniform

-4-

judicial procedure by which a vessel owner could seek to limit its liability under the Limitation Act. *Bouchard Transp. Co.*, 147 F.3d at 1347. Over time, these rules were amended and relabeled, and Rule F was eventually adopted as part of the Federal Rules of Civil Procedure. *Id.*

Rule F allows a vessel owner to file a complaint in district court to petition for limitation of liability within six months of receiving written notice of a claim. The owner must provide the court with relevant information regarding pending claims and the value of the vessel at issue. The district court determines the vessel's fair market value to establish the size of the limitation fund, from which damages may be paid to claimants. Together with the complaint, the vessel owner is required to provide one of three acceptable forms of security in the amount of the limitation fund. Once the owner files a valid complaint and provides security for the fund, the court enjoins all pending claims against the owner, and consolidates those claims into a special limitation proceeding. The court then determines the liability of the vessel owner and the proportion of the limitation fund payable to successful claimants.

This appeal focuses on the security for the limitation fund, and the interest payable on that security. Rule F(1) states that a vessel owner seeking to limit its liability "shall deposit with the court, for the benefit of claimants, a sum equal to the amount or value of the owner's interest in the vessel and pending freight, or approved security therefor." If the vessel owner elects to post an approved security, then the rule requires that the owner give security for "interest at the rate of 6 percent *per annum* from the date of the security." Rule F(1) (emphasis added).

At issue here is the meaning of the "per annum" language of Rule F(1), and the amount of interest that American Milling must pay on the security that it elected to post. American Milling argues that the "per annum" provision mandates simple interest. President Casino and the other claimants contend that the court's decision

to award compound interest was within its equitable discretion. We conclude that the claimants have the better argument.

The operative "per annum" language, standing alone, does not resolve the dispute. "Per annum" is defined in English to mean "in each year" or "annually." *Black's Law Dictionary* 1250 (9th ed. 2009). Accordingly, the six percent interest specified in Rule F(1) is an annual rate, but the plain language does not speak directly to whether the interest is to accrue on a compound or simple basis.

Rule F, however, was adopted against a background of law already in place. The provision requiring interest at the rate of six percent per annum from the date of the security dates back to 1891 when it was adopted as part of what was then known as Admiralty Rule 54. *The Fairwill*, 56 F. Supp. 887, 889 (E.D. Va. 1944). In 1920, due to a renumbering and revision process, the interest provision became part of Admiralty Rule 51. *See* 3 David E.R. Wooley & Antonio J. Rodriguez, *Benedict on Admiralty* § 5, at 1-25 (7th ed. 2009). In 1966, Rule F replaced Admiralty Rules 51-54, but retained the "per annum" interest language. *See id.* at 1-27.

Before 1891, courts enjoyed discretion to determine how much interest, if any, should be awarded in an admiralty case, and to establish the date from which it would accrue. *The Fairwill*, 56 F. Supp. at 889. The purpose of the interest provision, therefore, was to "take from the courts discretion upon the question of allowing interest, and to fix a rate of interest and when it should commence to run." *Id.* On the issue of compounding, however, both the Admiralty Rules and the Limitation Act are silent. *Cf.* 12 U.S.C. § 1823(g) (stating that interest on certain stock subscriptions shall be paid in "an amount equal to 2 per centum simple interest per annum"); 28 U.S.C. § 1961(b) (specifying that post judgment interest "shall be compounded annually").

A limitation of liability proceeding long has been recognized as "the administration of equity in an admiralty court." *Hartford Accident & Indem. Co. v. S. Pac. Co.*, 273 U.S. 207, 216 (1927). Although the "six percent per annum" provision eliminated some of the court's equitable discretion, the court retained considerable latitude to fashion an appropriate equitable remedy in each case. The absence of a rule on a specific issue such as compounding of interest "merely indicates that the question is governed by traditional judge-made principles," particularly "in admiralty, where the Judiciary has traditionally taken the lead in formulating flexible and fair remedies." *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 194 (1995) (internal quotation omitted). Accordingly, we think the better view is that the district court retained equitable discretion to award compound interest.

The law regarding the related matter of prejudgment interest supports the reasonableness of the district court's decision here. Prejudgment interest serves "to reimburse the claimant for the loss of the use of its investment or its funds from the time of the loss until judgment is entered." *Arco Pipeline Co. v SS Trade Star*, 693 F.2d 280, 281 (3d Cir. 1982). For this reason, courts frequently have awarded compound prejudgment interest in admiralty suits. The Seventh Circuit explained why "compound prejudgment interest is the norm in federal litigation:"

> Victims who finance their own cleanup [or repairs] lend to themselves; forced to devote money to a project not of their own choosing (money they otherwise could have lent out at the market rate of interest), they are entitled to compensation for the "hire" of this capital. Tortfeasors who choose to reinvest their money in their business . . . rather than create a trust fund must believe that the returns in their enterprise exceed the market rate. Having earned this higher rate of return for the duration of the litigation, they are in no position to complain when called on to pay prejudgment interest. An injurer allowed to keep the return on this money has profited by the wrong.

*In the Matter of Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1331-32 (7th Cir. 1992) (internal citations omitted).

Interest on a limitation fund serves a compensatory purpose similar to that of prejudgment interest. President Casino and the other claimants affected by the M/V Anne Holly's allision with the Eads Bridge in 1998 were forced to finance their own repairs throughout the course of this protracted litigation. They were unable to invest those funds elsewhere to earn a compound rate of return. At the same time, American Milling's ability to post security for the limitation fund enable it to invest the $2.2 million with the prospect of generating compound returns. Prejudgment interest is inadequate to compensate President Casino for the opportunity cost of the repairs, because no matter how much prejudgment interest is awarded, the amount of recovery may not exceed the limitation fund, and the damages alone in this case exceeded the value of the fund. Principles of equity, and the salutary goal of compensating the claimants for the use of their capital to repair damage caused by American Milling, thus support the district court's determination that the interest on the limitation fund should be compounded annually.

In opposition to this conclusion, American Milling points to *Cherokee Nation v. United States*, 270 U.S. 476 (1926), and the Supreme Court's statement that "[t]he general rule, even as between private persons, is that, in the absence of a contract therefor or some statute, compound interest is not allowed to be computed upon a debt." *Id.* at 490. This common law presumption against compound interest stemmed from a historical view that interest upon interest was "iniquitous and against public policy." *Whitcomb v. Harris*, 38 A. 138, 140 (Me. 1897). Courts did not wish to "hasten[] the accumulation of debt," *Abramowitz v. Washington Cemetery Ass'n*, 51 A.2d 461, 463 (N.J. Ch. 1947), and "sought to prevent an accumulation of compound interest in favor of negligent creditors who did not collect their interest when it became due." *State ex rel. Nw. Mut. Life Ins. Co. v. Bland*, 189 S.W.2d 542, 548 (Mo. 1945).

The Court in *Cherokee Nation*, however, cited in turn a series of state court decisions, including *Ellis v. Sullivan*, 134 N.E. 695 (Mass. 1922), where the Massachusetts court indicated an exception to the general rule in cases of equity:

> It has long been settled that interest on interest cannot be recovered . . . because of the ancient unwillingness to allow compound interest. While this is the general rule, it is not always followed. *In equity interest may be compounded and in the discretion of the court may be allowed where it is necessary for the purpose of affording a just and equitable accounting . . . .*

*Id.* at 697 (emphasis added) (internal citations and quotations omitted). Despite the general presumption against compound interest, decisions like *Ellis* recognized that compound interest is permissible in equity, even when prohibited at law. *See also Berman v. B.C. Assocs.*, 219 F.3d 48, 50 (1st Cir. 2000). *Cherokee Nation* involved a contract and a statute that were silent as to compounding, but the proceeding was not in equity, and the Court had no occasion to consider the equitable discretion to award compound interest.[2]

American Milling also relies on *United States v. Isthmian Steamship Co.*, 359 U.S. 314 (1959), a case involving a suit by a private party against the government under the Suits in Admiralty Act. American Milling contends that *Isthmian Steamship Co.* is especially relevant here, because the Suits in Admiralty Act, similar to Rule

---

[2]We note that even in cases at law, the vitality of the common law presumption against compounding is subject to question in light of modern economic understanding. *See Gotham Partners v. Hallwood Partners*, 817 A.2d 160, 173 (Del. 2002) ("The rule or practice of awarding simple interest in this day and age, has nothing to commend to it – except that it has always been done that way in the past.") (internal quotation omitted); *Reliable Mech., Inc. v. Naylor Indus. Servs., Inc.*, 125 S.W.3d 856, 857-58 (Ky. Ct. App. 2003) (holding that compound interest could be awarded at a court's discretion where the relevant state statute was silent as to compounding).

F(1), called for "interest at the rate of 4 per centum *per annum*." *Id.* at 325 (emphasis added) (quoting 46 U.S.C. § 743). The Court found "nothing in the rather ambiguous statute authorizing the accumulation of interest . . . and then a second independent award of interest which operates upon the first interest," and concluded that "[c]ompound interest is not presumed to run against the United States." *Id.* The Court then cited *Cherokee Nation* to support its conclusion that compound interest was not permitted. *Id.*

Although *Isthmian Steamship Co.*, unlike *Cherokee Nation*, involved an admiralty proceeding and a statute with "per annum" language, we are not persuaded that the decision sweeps as broadly as American Milling suggests. The holding of *Isthmian Steamship Co.* is limited by its terms to claims for compound interest *against the government*, where a special presumption against compounding carried the day.

For these reasons, we conclude that Rule F(1) permits the district court, in its discretion, to award compound interest at a rate of six percent annually. In the circumstances of this case, the district court's award was not an abuse of discretion.

III.

American Milling also challenges the district court's decision to deny the company's motion to deposit the cash value of the limitation fund into the court's registry. We review the district court's interpretation of Rule F(1) *de novo*, and examine the court's exercise of permissible discretion under that rule for abuse of discretion.

Pursuant to Rule F(1), a vessel owner may post security under the Limitation Act in one of three ways: "physical surrender of the vessel and pending freight to a

trustee; a deposit with the court of cash equal to the amount or value of his interest in the vessel and pending freight; or 'approved security therefor.'" *In re Compania Naviera Marasia S.A.*, 466 F. Supp. 900, 901 (S.D.N.Y. 1979) (quoting Rule F(1)). In January 2001, American Milling elected to post a security, and the district court approved it. This option required American Milling to pay interest on the security at the six percent annual rate specified in Rule F(1), but the choice also permitted the company to have continued use of its cash throughout the proceedings and to avoid interest payments altogether if the company was not found liable for damages.

Once it became clear that American Milling was liable for eighty percent of the damages, and interest rates fell below the six percent required by Rule F(1), it was no longer advantageous for American Milling to maintain the security. A decision to allow American Milling to deposit the $2.2 million with the court would have favored the company's economic interests, but it would have been detrimental to President Casino and the other claimants. The interest generated through the court's investment of the deposited funds almost certainly would have been less than six percent.

American Milling now contends that because depositing cash with the court is an acceptable method of posting security under Rule F, the district court must allow it to choose that option at any time during the proceedings, regardless of the effect on the claimants. But given that a limitation proceeding is "the administration of equity in an admiralty court," *Hartford Accident & Indem. Co.*, 273 U.S. at 216, it was reasonable for the court to give substantial weight to the negative impact of American Milling's motion on the claimants, who had been forced to finance their own repairs and thereby lend to themselves throughout the proceedings. *See The Ontario No. 1*, 80 F.2d 85, 87 (2d Cir. 1935); *In re Kingston Shipping Co.*, 182 A.M.C. 134, 135-36 (M.D. Fla. 1982). American Milling could have chosen under Rule F(1) to deposit cash with the court at the beginning of the proceedings, but it was not an abuse of

discretion for the district court to forbid the company to change its position at a late stage in the litigation in a manner that would have been detrimental to the claimants.

\*       \*

The judgment of the district court is affirmed.

_____