E. A. Camfield et al., appellees and cross-appellants,
v. James G. Olsen et al., appellants and
cross-appellees.

164 N. W. 2d 431

Filed January 17, 1969. No. 37055.

McGinley, Lane, Mueller & Shanahan, for appellants.

Firmin Q. Feltz and Baskins, Baskins & Schneider, for appellees.

Heard before White, C. J., Spencer, Boslaugh, Smith, McCown, and Newton, JJ., and Moran, District Judge.

Smith, J.

Sellers sued to foreclose buyers' equity of redemption under an installment contract for purchase of a motel. A cross-petition for damages alleged that sellers had induced formation of the contract by false representations of motel earnings and flooding. The district court found default of buyers under the contract and false representations of earnings alone. Ordering foreclosure by sale, it assessed buyers' damages in the nominal sum of $10 which it credited to them on the amount due sellers. Buyers ask us in de novo review on appeal to find false representations of flooding and to allow them substantial damages. The finding concerning false representations of earnings is assigned on cross-appeal for error.

The agreement was signed February 27, 1964, by E. A. Camfield and his wife, sellers, and by James G. and Helen E. Olsen, buyers. Olsens agreed to purchase real and personal property known as the Starlite Motel that fronted on the north side of U. S. Highway No. 30 in Ogallala, Nebraska. The price was $42,500, less $19,500 for conveyance of other lands from Olsens to Camfields, and the balance was payable in monthly installments.

Camfield, a real estate broker and auctioneer at North Platte, had been acquainted with Jesse and Ombolena Vath in the period 1955-1961 when Vaths had owned the motel. Representing other owners in 1961, Camfield cried an auction of the motel. He himself as owner sold it in 1962, reacquiring possession and title in joint tenancy with his wife November 1, 1963. Vaths operated the motel for Camfields until March 1, 1964, when Olsens took possession.

A response of Olsens to a newspaper advertisement had led to a trip February 7, 1964, by Camfield to Olsens' door. Their bargaining positions were disparate. James Olsen had attended school through grade 8. At age 55 and with some farming and ranching experience he was out of work. Helen had acquired no formal education beyond high school. Residing at Alma, Olsens were unacquainted with Ogallala, 120 miles away. Camfield and Olsens met on six occasions in February. Only one meeting, and that on the 16th, occurred at the motel, Olsens having arrived there the preceding evening to stay overnight.

The Olsen version of Camfield's representations is summarized as follows: Camfield said the motel had always been a "good money maker." Since November 1, 1963, he had pocketed $200 a month above all expenses which had included a monthly salary of $200 for Vaths' management. Vaths as owners had discharged a mortgage indebtedness of $19,000 out of income from the motel. Camfield pointed out books concerning motel operations, but he gently dissuaded Olsens from inspec-

tion of pertinent records. At the motel meeting he spoke of flooding. A 5-inch rain and failure of a dam or ditch north of Ogallala on Thursday, May 30, 1963, he said, had caused flooding of the motel. To his knowledge, which went back 15 years, no other flooding had happened there. He reassured Olsens that a "mound of dirt" built by him along the south boundary would prevent a recurrence. He exhibited the June 3, 1963, editions of the Keith County News which Olsens did not read. The newspaper contains a story as follows in part:

"Rains * * * to three inches were measured in the Ogallala area Thursday evening sending water over the curbs, flooding some business firms and basements in residential areas. * * * Winds of 70 miles per hour accompanied the downpour * * *. * * * basements were flooded and communications interrupted early Friday night when torrential rain and hail, lashed by violent shifting winds, struck Ogallala * * *. Observers called it the most violent storm of its kind in recent years."

Camfield's testimony is summarized as follows: He made no such representations of earnings, except the one about discharge of Vaths' indebtedness. He cautioned Olsens that he had lost money in operating the motel, and he laid relevant records in full view for examination. He fully disclosed the conditions of flooding that he had seen June 3, 1963, upon his arrival at the motel from Colorado. The newpaper story was read by Olsens.

Testimony of other witnesses is summarized as follows: Camfield at the auction in 1961 mentioned past flooding and present protection in the form of a "mound of dirt." The direction of flow, however, was southeast, not north. In 1961 motel guests, suitcases in hand and trousers rolled to the knees, waded out of their rooms through water a foot deep. Maxine Downin, a purchaser of the motel under contract from Camfields in March 1962, saw the premises flooded on five separate occasions that year. Rooms took water 8 to 12 inches deep, and registration cards recorded resulting refunds

to guests. Vaths themselves informed Olsens of flooding there in 1958 and 1960. Others associated flooding with every heavy rain.

Camfield's attorney, M. C. McCarthy, spent more than an hour explaining to Olsens the draft agreement before they signed. It contained a disclaimer clause made up of generalities and the following details: "Buyers * * * stayed at said Motel and personally and fully inspected and investigated the same * * * February 15 * * * and * * * 16 * * * and * * * have seen the news article in the Keith County News dated June 3, 1963, reporting the conditions resulting in the flooding of said Motel, and that said operators (Vaths) have told them that said Motel had been flooded on two previous occasions when said operators owned said Motel, but that Sellers, and Sellers hereby state that they, had no knowledge of any previous flooding of said Motel prior to June 3, 1963, and Buyers hereby acknowledge that said operators have instructed them on how they thought the Motel could best be cleaned up if another flood should occur * * *."

Estimates of actual value of the real and personal property ranged from $20,000 to $40,000. James Olsen and a real estate broker, assuming the property to have been as represented by Camfield in Olsens' testimony, estimated its value at $42,500.

An essential element of actionable false representation is justifiable reliance on the representation. Riddle v. Erickson, *ante* p. 122, 158 N. W. 2d 608; Russo v. Williams, 160 Neb. 564, 71 N. W. 2d 131; Trebelhorn v. Bartlett, 154 Neb. 113, 47 N. W. 2d 374. A disclaimer clause of a bargain is relevant to an issue whether claimant in fact relied on a false representation disclaimed in the clause. The disclaimer is, however, ineffective to preclude a trier of fact from considering whether or not fraud induced formation of the bargain. Martin v. Harris, 121 Neb. 372, 236 N. W. 914.

A general measure of damages for fraud is compensa-

tion for loss occasioned by the fraud. Harsche v. Czyz, 157 Neb. 699, 61 N. W. 2d 265. Compensation in many cases is the difference between value of property as represented and actual value. See, Dargue v. Chaput, 166 Neb. 69, 88 N. W. 2d 148; Welch v. Reeves, 142 Neb. 171, 5 N. W. 2d 275. See, also, Note, 47 Va. L. Rev. 1209.

We find for Olsens on the issues of false representations of earnings and flooding, and we assess damages at $10,000. The judgment of foreclosure was prejudicially erroneous in offsetting $10 instead of $10,000 on the amount due Camfield on the contract. The present status of the case in district court is not disclosed, no supersedeas bond having been given. If equitable remedy is inappropriate, the district court on remand is to render money judgment for $10,000 in favor of Olsens and against Camfield.

The judgment is reversed and the cause remanded for proceedings in accordance with this opinion.

REVERSED AND REMANDED.