ARTHUR J. ABBOTT, APPELLANT, V. ETHEL S. ABBOTT, APPELLEE.

174 N. W. 2d 335

Filed February 17, 1970. No. 37321.

Wright, Simmons & Hancock, for appellant.

Finlayson, McKie & Fisk and Lester A. Danielson, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

SMITH, J.

Arthur Abbott sued his stepmother, Ethel, to recover damages for promissory fraud and undue influence. He alleged that she thus had caused him to settle objections by his sisters to probate of their father's will. The district court rendered summary judgment for Ethel, and Arthur has appealed. Questions concern (1) relation back of amended pleadings for limitation purposes, (2) justifiable reliance on a promise made with intent not to perform it, (3) applicability of the parol evidence rule to promissory fraud, and (4) legality of bargain.

In the posture of the case parts of the record favorable to Ethel are excluded from the following summary.

Besides Ethel and Arthur, survivors of Christopher J. Abbott, deceased, were Le Roy Abbott, brother, and Glaideth Frank and Phyllis Drummond, daughters. Christopher's will gave one-half of his estate to Ethel. Le Roy, Arthur, and Glaideth were named specific legatees. Arthur, Glaideth, and Phyllis were named beneficiaries of the remainder in equal shares. The will was subscribed by four witnesses: Le Roy, Ethel, Arthur, and Miles Lee, a lawyer and not a beneficiary.

Glaideth and Phyllis were threatening to contest probate of the will on grounds of defective attestation. Arthur's counsel argues that the threat was telling: ". . . a serious problem presented itself to Mrs. Abbott. If there was a will contest, she would have to testify. If she testified (regardless of the result of the will contest) she would receive one-fourth instead of one-half of the estate (a difference of $1,250,000.00). If, however, there was no contest, then Mrs. Abbott need not testify and the will could be proved by Miles Lee, alone, and Mrs. Abbott would receive one-half of the estate."

On March 29, 1954, Arthur without an attorney attended a conference of family members and attorneys in Omaha. There he volunteered to share equally with Glaideth and Phyllis. Ethel reacted by orally promising to pay him an amount out of her share upon distribution of the estate. The amount was fixed at the difference in value between the property covered in the will provisions for Arthur and the property distributed to him from the estate. Ethel attached conditions that he agree to share equally with his sisters and that the sisters agree not to contest probate of the will. On May 6 and 10 Ethel again orally promised payment. Conditions were that Arthur sign the proposed written settlement, that he appear as a subscribing witness to the will in county court, and that he obtain written approval of the written settlement from his attorney, Miles Lee.

The will was admitted to probate in accordance with the settlement, dated May 6, 1954, but signed by Arthur

on May 10. The settlement in the main saved the testamentary gift of one-half the estate to Ethel. By its terms the property specifically bequeathed to Arthur and Glaideth, and $128,816.70 which Ethel paid because of a ranch that Phyllis for convenience had conveyed to Christopher, went equally to Arthur, Glaideth, and Phyllis.

Arthur received $303,415.25 less than he would have received under the will without settlement. There is a suggestion that he would have received less under the will than under the statutes of descent and distribution.

As counsel for Arthur, Miles in writing approved the family settlement. Arthur had retained him after the Omaha conference and after a suggestion by Ethel to Miles respecting the retainer. Miles had prepared a letter addressed to himself. The letter, signed by Arthur on May 10, date of the probate hearing, reads:

"I have signed the agreement . . . without your consent. I fully understand that it is a large financial sacrifice . . . I know that you have strenuously advised me against signing such a contract. However, after talking with Ethel and Le Roy Abbott, I felt determined not to go back on the voluntary offer I made at the Omaha conference . . . Against your counsel . . ., I have directed you as my attorney to approve the stipulation settling the estate controversies and admitting my father's will to probate."

Miles explained why he had insisted upon the letter from Arthur: ". . . Arthur was rather changeable and also inexperienced in business matters and he was in close relationship with Ethel . . . I knew of the influence Ethel Abbott may have over him and I wanted that (letter) for my own protection . . . Ethel . . . very largely dominated all business matters that affected Arthur and . . . the estate."

Prior to the end of May 1954, Miles was discharged

as attorney for Arthur and for Le Roy, Ethel, and Arthur as personal representatives of the estate.

Warren Johnson, attorney for Glaideth and Phyllis, had conferred on April 6, 1954, with Barton Kuhns, attorney for Ethel. Warren expressed doubt whether his clients would agree to settle at the expense of Arthur but not of Ethel unless Arthur should receive additional property. Barton stated that such an agreement must never be in writing. Warren departed with the impression from Barton that the settlement would not cause Arthur substantial loss. Glaideth, Phyllis, and their attorneys on May 10, 1954, did not otherwise know of oral promises by Ethel to Arthur.

Warren, Glaideth, and Phyllis made affidavits that the alleged oral promises had not resulted in misrepresentations to affiants. The settlement had been fair to the sisters. They did not consider themselves entitled to any part of what Ethel may have promised Arthur.

Arthur commenced action on his original petition on December 26, 1963. The petition and the first amended petition alleged the will, the family settlement, the oral promises by Ethel, acceptance and performance by Arthur, and nonperformance by Ethel. There was no allegation of fraud or undue influence. On January 4, 1965, more than 4 years after distribution of the estate on February 9, 1960, Arthur filed a second amended petition. It introduced promissory fraud and undue influence.

Prior opinions concerning the statute of limitations contain these rules: Commencement of action on the original petition may stop the running of the statute, although the petition fails to state a cause of action. Merrill v. Wright, 54 Neb. 517, 74 N. W. 955 (1898). One test is whether identity of the cause of actions is preserved. May Plumbing Co. v. Shaver, 182 Neb. 251, 153 N. W. 2d 911 (1967); J. R. Watkins Co. v. Wiley, 182 Neb. 242, 153 N. W. 2d 871 (1967). If the cause of action in the amendment is entirely independent, the

statute runs against it until filing of the amendment. Independence does not exist when the amendment depends entirely upon different reasons for holding defendant responsible, although the alleged injury is the same. Blair v. Klein, 176 Neb. 245, 125 N. W. 2d 669 (1964).

Our rules are objectionable in the best modern view of desirability of adjudications on the merits. We therefore reformulate the general rule: A cause of action pleaded by amendment ordinarily relates back to the original pleading provided that claimant seeks recovery on the same general set of facts. See, Wilson v. Bittick, 63 Cal. 2d 30, 45 Cal. Rptr. 31, 403 P. 2d 159 (1965); 1A Barron & Holtzoff, Federal Practice and Procedure, § 448, p. 753 (1960); Clark on Code Pleading, § 118, p. 729 (2d Ed., 1947); 3 Moore's Federal Practice, §§ 15.05 and 15.15 (3), pp. 833 and 1025 (2d Ed., 1968). Commencement of the action on Arthur's original petition stopped the running of the statute against the cause of action in the second amended petition.

The maker of a fraudulent misrepresentation is not liable to one who does not rely upon its truth but upon the expectation that the maker will be held liable in damages for its falsity. Restatement, Torts, § 548, p. 108. The record fails to establish that Ethel is entitled to judgment as a matter of law on this issue.

The parol evidence rule does not prevent reception or consideration of evidence to prove promissory fraud. See, Transportation Equipment Rentals, Inc. v. Mauk, 184 Neb. 309, 167 N. W. 2d 183 (1969); Chapin v. Noll, 118 Neb. 318, 224 N. W. 687 (1929); McCready v. Phillips, 56 Neb. 446, 76 N. W. 885 (1898). See, also, Sweet, "Promissory Fraud and the Parol Evidence Rule," 49 Cal. L. Rev. 877 (1961). A contrary indication in Security Savings Bank v. Rhodes, 107 Neb. 223, 185 N. W. 421, 20 A. L. R. 412 (1921), is disapproved.

Ethel argues illegality on the single ground that such a bargain would have defrauded Glaideth and Phyllis.

The argument is not persuasive. Glaideth and Phyllis on this record have not suffered wrongs that entitle Ethel to reap a benefit by insisting upon illegality. Settlement of a will contest, unlike a composition among creditors, does not rest upon the assumption of equality among various claimants and heirs. Callaghan v. Corbin, 255 N. Y. 401, 175 N. E. 109, 81 A. L. R. 1184 (1931).

The summary judgment is reversed and the cause remanded.

REVERSED AND REMANDED.

WHITE, C. J., and CARTER and NEWTON, JJ., concurring in the result but dissenting in part.

We concur in the result reached in this case but dissent from that part of the majority opinion that purports to change and adopt a new rule in this state with reference to the running of the statute of limitations on an amended cause of action.

The general rule is that an amendment introducing a new cause of action does not relate back to the commencement of the action with respect to limitations but is the equivalent of a new suit, so that the statute of limitations continues to run until the time of the filing of the amendment. In all of the jurisdictions in this country passing upon the subject we can find no deviation from this statement of the general rule. The statement of the law above made is taken from 54 C. J. S., Limitations of Actions, § 281, p. 335. Several hundred cases are cited in support of this rule from almost all jurisdictions and the 1969 cumulative annual pocket part cites two full fine-printed columns of recent cases from 26 jurisdictions in support of this rule. In either the original text statement or in the recent cases no decisions are cited as being contrary to this general rule.

Our rule has always been the same. See, 54 C. J. S., Limitations of Actions, § 281, p. 336; Streight v. First Trust Co. of Omaha, 133 Neb. 340, 275 N. W. 278 (1937); Emel v. Standard Oil Co., 117 Neb. 418, 220 N. W. 685 (1928). More recently we have specifically affirmed

the rule. Tennyson v. Werthman, 167 Neb. 208, 92 N. W. 2d 559 (1958); Blair v. Klein, 176 Neb. 245, 125 N. W. 2d 669 (1964); Horn's Crane Service v. Prior, 182 Neb. 94, 152 N. W. 2d 421 (1967); May Plumbing Co. v. Shaver, 182 Neb. 251, 153 N. W. 2d 911 (1967); J. R. Watkins Co. v. Wiley, 182 Neb. 242, 153 N. W. 2d 871 (1967).

It is true that the authorities and the cases are diverse and vary in the application of this rule to a particular set of facts or a particular pleading situation. Nevertheless, the rule that we have and the undisputed general rule have furnished a specific guideline for the determination of cases.

We cannot accept the statement in the majority opinion that our time-honored rule, supported by the conclusive weight of authority, is objectionable "in the best modern view." Further, the overruling of all of our previous cases in this matter and the adoption of a new rule is accomplished without discussion or analysis. It is a flat and arbitrary statement of a new rule. Only one California case is cited in support thereof. In the interest of brevity we will not discuss or attempt to analyze this one case except to state that it does lend some support to the rule stated. This case cites only previous California decisions and a close reading of this case and its supporting California decisions leaves us in doubt that such rule is the law in California. We note that the annotator in Corpus Juris Secundum cited *supra* cites the same case as supporting the general rule.

We further point out that the purported new statement of the rule depending upon a "general set of facts" is so vague in nature that it would furnish virtually no guideline at all for use in application to particular cases. In a matter which is essentially procedure and where certainty and definiteness are desired, we feel that this is a step backward. It is so general that the pressure of equities in a particular case could easily lead this court and the lower courts to a vicarious and irrecon-

cilable determination of individual cases. Above all, in practice we feel that it would leave the practicing lawyer without a suitable guide.

The Legislature has established, by statute, our law on the statute of limitations. The accrual of a "cause of action" is the statutory and universal guideline. Our past interpretations of this specific statutory language have met no legislative changes or resistance, much less any overruling of our prior decisions.

For these reasons we dissent from that portion of the majority opinion which purports to change the part of the established law of the State of Nebraska without discussion and with only chimera of authority to support it. The result in this case should and could be reached under the established law and the application of the general rule.