ARTHUR J. ABBOTT, APPELLEE AND CROSS-APPELLANT, V. ETHEL S. ABBOTT, APPELLANT AND CROSS-APPELLEE. 195 N. W. 2d 204

Filed March 3, 1972. No. 38010.

Finlayson, McKie & Fisk and Lester A. Danielson, for appellant.

Wright & Simmons, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

SMITH, J.

Damages for promissory fraud in settlement of objections to probate of a will were sought by Arthur J. Abbott from Ethel Abbott, his stepmother. On remand after Abbott v. Abbott, 185 Neb. 177, 174 N. W. 2d 335 (1970), a jury found for Arthur. The district court

awarded him prejudgment interest on the amount of the verdict from February 9, 1960, the date of final distribution of the assets of the estate.

Ethel appeals. She' assigns for error (1) the denial of her motion for judgment notwithstanding the verdict and (2) the award of interest. Arthur cross-appeals. He asserts error in the court's denying him prejudgment interest compounded annually.

## SUMMARY OF EVIDENCE

Christopher J. Abbott at the time of his marriage to Ethel in 1933 was the father of Arthur, age 18, Glaideth, and Phyllis. On January 10, 1954, Christopher died leaving a form of will. It gave one-half the estate to Ethel and out of the other half, specific legacies to Christopher's brother, LeRoy Abbott, Arthur, and Glaideth. It provided for distribution of the remainder to Arthur and his sisters in equal shares. The subscribing witnesses were LeRoy, Ethel, Arthur, and Miles Lee, a lawyer and nonbeneficiary.

Arthur and his sisters, accepting an invitation that excluded any counsel for them, attended a meeting of named beneficiaries. Other beneficiaries were present with counsel. In the confusion and with pressure on them the sisters departed to seek legal advice. They subsequently threatened to contest probate of the will. One objection was defective attestation argued as follows: In event of a will contest Ethel, a subscribing witness, would be compelled to testify. Upon doing so, regardless of the outcome of the contest, she would receive only one-fourth, her intestate share, instead of one-half. The difference between the one-fourth and the one-half was $1,250,000. In the absence of a contest the will would be admissible without her testimony, and she would receive a one-half share. Everyone conceded that the objection was sound.

On March 29, 1954, at a meeting in Omaha of all beneficiaries, except the sisters, Arthur alone was not represented by counsel. There he suddenly offered to give

up enough property to equalize the childrens' shares. Equalization was acceptable to the sisters provided Ethel made up the difference. During the meeting but only in the presence of Arthur and Lee, the promise in suit was given orally by Ethel. She would pay Arthur the difference in value between the property covered in the will provisions for him and the property distributed to him from the estate. The difference would be payable upon final distribution of the assets of the estate. Ethel subsequently repeated the promise, attaching conditions that Arthur would assist in winning his sisters and in gaining admission of the will to probate. Arthur performed.

Counsel, negotiating terms of a settlement, prepared several drafts without consulting Arthur, who had not engaged counsel. The final draft was to be approved in writing by counsel for each party. Upon advice then given by Ethel, Arthur engaged Lee to represent him and the estate. Lee subsequently advised Arthur that the offer of settlement which did not express Ethel's prior oral promise was grossly unfair and unacceptable. Arthur agreed, but he subsequently informed Lee that he intended to sign anyway, and he requested Lee's written approval. Lee approved the settlement but only after Arthur signed a letter setting out Lee's actual advice and in effect exonerating Lee from malpractice.

The settlement was signed on May 10, 1954, the day the will was admitted to probate. It generally saved a one-half share for Ethel. Arthur received $303,412.25 less than he would have received under the will without the settlement. The provision for him under the will was less than was the provision for him under the statutes of descent and distribution. Arthur testified to reliance on the oral promises of Ethel.

Prior to June 1, 1954, Lee was discharged as attorney for Arthur and the estate. From that time to April 1962 Arthur acted without the advice of counsel.

A meeting was held in Lincoln on July 10, 1959, relat-

ing to final distribution of estate property. There Arthur twice was queried whether any promise other than an unrelated one given at the funeral, had been made to him by Ethel. According to his testimony, Arthur knew that he must take a stand then or never, but he thought Ethel's oral promises were not enforceable. The room was quiet for several minutes. Arthur hung his head. Then, according to two lawyers, and Arthur himself, he twice answered, "There were no promises." According to Glaideth and Phyllis, Arthur in a low voice quietly added, "at least not in writing."

Christopher orally had promised Arthur some cattle that were undelivered at his death. At the funeral and prior to any inkling of probate objections Ethel promised Arthur that she would deliver the cattle. That promise was the one mentioned at the meeting in Lincoln. It had not been covered in the family settlement agreement or in plans for final distribution of estate property. On December 29, 1959, Arthur signed an instrument acknowledging receipt of the cattle. His signature was witnessed by LeRoy and James C. Quigley, a lawyer, who had represented LeRoy in the family settlement. The instrument, typewritten, was headed "RECEIPT." It began: "RECEIVED of Ethel S. Abbott . . . 250 . . . head of cattle . . . classified as follows . . .." After listing 11 classes, the value of each, and the total, $37,420, it continued: "in full and complete payment and satisfaction of the only verbal promise made by . . . Ethel . . . to the undersigned, in the deduction of said cattle from her distributive share of the cattle belonging to the estate of Christopher J. Abbott, deceased, the same to be a part of my inheritable share of cattle belonging to said estate."

At the time Arthur signed the "receipt," according to him, he was under pressure to locate ranch land for his cattle. The lease and the receipt formed a single transaction. He read the receipt hurriedly, and he did not notice the disclaimer clause. Had he noticed it, ac-

cording to his testimony, he would not have signed the receipt.

Arthur, a college graduate with a degree in business administration, had been managing ranches of Christopher. He also was a director of several banks. A jury, however, might reasonably find the relationship between Arthur and Ethel to have been the one summarized by Lee: "Well, it seemed obvious, of course, that Arthur . . . was greatly dependent upon someone after his father's death. Ethel . . . took the role of mother as much as a stepmother could. And of course I would say very largely dominated all business matters that affected Arthur and affected the estate. Q. In your observation did Ethel . . . have control over Arthur? A. In my opinion she very largely did, she very largely did."

Pleadings and pretrial stipulations established the following facts: Entry of final decree in the estate and final distribution of the assets had occurred February 9, 1960. Arthur received assets with a value of $303,-415.25 less than the value of the assets he would have received under the will. Arthur's petition prayed for recovery of $303,415.25, with interest at 6 percent a year from February 9, 1960. The district court found the claim to be liquidated. It allowed Arthur interest in accordance with the prayer, the $303,415.25 set out in the jury verdict being fixed as a matter of law.

### MOTION BY ETHEL FOR JUDGMENT

Ethel contends that the clause in the "receipt" contractually disclaimed promissory fraud on her part, and that it was a release. Several general rules relating to fraud in contract, tort, or both arguably support her contention. A person who offers no explanation to avoid a receipt in which he acknowledged full payment of the amount due under a written agreement not to contest a will in consideration for such payment may not recover. See Knoll v. Knoll, 173 Neb. 602, 114 N. W. 2d 40 (1962). Generally in the absence of fraud, one who does not choose to read a contract before signing it can-

not later relieve himself of its burdens. General Motors Acceptance Corp. v. Blanco, 181 Neb. 562, 149 N. W. 2d 516 (1967). Where ordinary prudence would have prevented the deception, an action for fraud perpetrated by such deception will not lie. Swanson Petroleum Corp. v. Cumberland, 184 Neb. 323, 167 N. W. 2d 391 (1969). Generally a mistake of law is one upon which a party cannot rely, as all parties are bound to know the law. Beltner v. Carlson, 153 Neb. 797, 46 N. W. 2d 153 (1951).

Other rules lend support to the submission of promissory fraud issues to the jury in this case. The parol evidence rule does not prevent reception or consideration of evidence to prove promissory fraud. Abbott v. Abbott, 185 Neb. 177, 174 N. W. 2d 335 (1970); cf. Central Constr. Co. v. Osbahr, 186 Neb. 1, 180 N. W. 2d 139 (1970). A disclaimer clause of a bargain is relevant to the issue whether the claimant in fact relied on the false representation disclaimed in the clause. Without more the clause is ineffective to preclude a trier of fact from considering whether fraud induced formation of the bargain. Camfield v. Olsen, 183 Neb. 739, 164 N. W. 2d 431 (1969). The rules in general attempt to strike a balance among competing policies. Objectivity and certainty in the law of contracts are desirable, but at times they are too weak to protect legitimate expectations of fair dealing.

The emphasis upon fair dealing is nowhere more apparent today than it is in the article of the Uniform Commercial Code relating to sales. "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." § 2-302(1), U.C.C.

Apart from statute, the need for security of transactions in the traditional sense has yielded somewhat to

the need for flexibility. See, Keeton, "Fraud-Statements of Intention," 15 Tex. L. Rev. 185 (1937); Kessler and Fine, "Culpa in Contrahendo, Bargaining in Good Faith, and Freedom of Contract: A Comparative Study," 77 Harv. L. Rev. 401 at 448, 449 (1964); Seavey, "Caveat Emptor as of 1960," 38 Tex. L. Rev. 439 (1960). A disclaimer clause in a family settlement agreement will not necessarily bar recovery for fraud. A subsequent agreement for a valuable consideration is sometimes strong evidence against the claimant. It may be strong enough to bar recovery as a matter of law. Among the elements for consideration of its effect are the presence or absence of specific assent to the disclaimer, the extent of any inequality of bargaining power, the adequacy of the consideration, and the nature of the relationship between the parties. Cf. Note, 47 Cornell L.Q. 655 (1962). In this case the evidence, including the disclaimer clause of December 29, 1959, was sufficient to support a verdict for Arthur on the issue of promissory fraud.

PREJUDGMENT SIMPLE INTEREST

Where the amount of a claim is liquidated, compensation in the form of prejudgment interest is allowed as a matter of right. "A claim is liquidated if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion or discretion. Examples are claims upon promises to pay a fixed sum, claims for money had and received, claims for money paid out, and claims for goods or services to be paid for at an agreed rate." McCormick, Damages, c. 7, § 54, p. 213 (1935). See, also, § 45-104, R. R. S. 1943; Mid States Engineering v. Rhode, 182 Neb. 590, 156 N. W. 2d 149 (1968).

In the present case the value of all property in the estate for inheritance and estate taxation was determined prior to final distribution. Arthur and Ethel were legal representatives of the estate. Those data were sufficient for the court properly to conclude that the claim of Arthur was liquidated. The allowance of pre-

judgment interest was correct. See generally Oleck, Damages to Persons and Property, §§ 300 and 301, pp. 641 to 651 (1961).

## COMPOUND INTEREST

Arthur and Ethel were fiduciaries, and Arthur argues an analogy of trust law. Most jurisdictions allow a beneficiary under certain circumstances to recover compensation in the form of prejudgment compound interest from the trustee. See, Restatement, Trusts 2d, § 207 (2) (1959); 1 Sedgwick on Damages, § 344, p. 680 (9th Ed., 1912).

The general rule is that in the absence of contract or statute, compensation in the form of compound interest is not allowed to be computed upon a debt. See, Cherokee Nation v. United States, 270 U. S. 476, 46 S. Ct. 428, 70 L. Ed. 694 (1926); United States v. Marina Realty Co., 82 F. Supp. 640 (D. C. Puerto Rico, 1949); Blanchard v. Dominion Nat. Bank, 130 Va. 633, 108 S. E. 649, 27 A. L. R. 78 (1921).

We need not decide whether compensation in the form of compound interest on a claim of fraud is ever recoverable. The evidence in this case compelled no such allowance.

The judgment is affirmed.

AFFIRMED.

CLINTON, J., concurring.

I concur in the result and in the opinion of the court, but I would deal with the issues raised by the "receipt" as follows. The recital in the "receipt" re "the only oral promise" was at most merely an admission against interest. In any event it is ambiguous on its face as to whether it pertains to the transaction which is the basis of the suit. Dunn v. Alexander, 104 Neb. 628, 178 N. W. 215, governs. The receipt raised only a jury question and the jury found for Arthur.

BOSLAUGH, J., dissenting in part.

I dissent from that part of the opinion of the court that allows the plaintiff prejudgment interest. In a case as

doubtful as this, the defendant should be allowed to litigate her rights without the risk of a judgment that will include more than $200,000 in interest.

WHITE, C. J., concurs in this dissent.