# Supreme Court of Texas

No. 22-0215

Samson Exploration, LLC, f/k/a/ Samson Lone Star, L.P.,

*Petitioner*,

v.

Joe A. Bordages Jr., et al.,

*Respondents*

On Petition for Review from the
Court of Appeals for the Ninth District of Texas

**Argued October 26, 2023**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

The central issue in this case is whether a mineral-lease provision calls for simple or compound interest on unpaid royalties. Because the lessee has previously litigated the identical lease language with a different lessor and lost, we must also consider whether it is collaterally estopped to relitigate the same issue here. We hold that because Texas law disfavors compound interest, an agreement for interest on unpaid amounts is an agreement for simple interest absent an express, clear, and specific provision for compound interest. We also hold that the

lessee's prior litigation of the issue does not collaterally estop it from asserting its claims here. Accordingly, we reverse the judgment of the court of appeals[1] and remand the case to the trial court for further proceedings.

## I

Petitioner Samson Exploration, LLC holds oil-and-gas leases on properties in Jefferson and Hardin Counties from several families, including the Klorers, the Hookses, and the Bordages.[2] The three families sued Samson for unpaid royalties owed under those leases. Their claims were severed into three different suits, and only the Bordages' case remains unresolved.[3] Samson has paid the Bordages all royalties due plus late charges as per its calculations. The remaining issue, now before us, is whether the Bordages are entitled to late charges on the late charges.

The leases between Samson and the Bordages provide that

---

[1] 662 S.W.3d 501 (Tex. App.—Beaumont 2023).

[2] Respondents are Joe A. Bordages, Katherine Bordages Brownlee, Stephanie Bordages Knobel, Joseph A. Bordages III, Joanna M. Pastore, Scott Alan Bordages, and Allison Bordages Koskella.

[3] After Samson failed to remit the Bordages' and Hookses' royalty payments, they joined in the Klorers' existing suit against Samson (the *T.S. Reed* case). Samson moved to sever the three families' claims. That request was granted. Thus, the Bordages, Hookses, and Klorers proceeded against Samson in three distinct lawsuits. The *T.S. Reed* and *Hooks* cases have since been fully litigated and resolved, leaving only the *Bordages* case active. *See Samson Lone Star, L.P. v. Hooks*, 389 S.W.3d 409 (Tex. App.—Houston [1st Dist.] 2012), *rev'd in part*, 457 S.W.3d 52 (Tex. 2015), *on remand*, 497 S.W.3d 1 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 26 (Tex. App.—Beaumont 2015), *aff'd*, 521 S.W.3d 766 (Tex. 2017).

royalty payments are due by the first day of the calendar month following some sixty days after production.[4] If not timely paid, a late charge is imposed the next day "based on the amount due" and "at the maximum rate allowed by law". That charge is payable on the last day of the month.[5]

If no payment is made by that date, the Bordages argue that another late-charge calculation is triggered, which includes not only past-due royalties as of the first day of the month, but also accrued late charges as of the last day of the preceding month. Put differently, the Bordages believe that the leases' Late Charge Provision imposes late charges on late charges, compounding them each month. The parties agree that the late charges constitute a form of interest and that the rate is 18%. Samson disagrees that the late charges are compounded.

## II

The Bordages argue that Samson is collaterally estopped from litigating the meaning of the Late Charge Provision. The Hookses had leases with Samson that were separate from, but identical to, those

---

[4] Art. XVII(B): "The royalty for the calendar month in which production is first marketed shall be paid on or before the first day of the calendar month next following the expiration of sixty (60) days [from execution of a completion report or potential test for the well], and the respective royalty payments for each subsequent calendar month of production shall be made [o]n or before the first day of each successive calendar month . . . ."

[5] Art. XVII(C): "All past due royalties . . . shall be subject to a Late Charge based on the amount due and calculated at the maximum rate allowed by law commencing on the day after the last day on which such monthly royalty payment could have been timely made and for every calendar month and/or fraction thereof from the due date until paid . . . . Any Late Charge that may become applicable shall be due and payable on the last day of each month when this provision becomes applicable."

3

between Samson and the Bordages. In the *Hooks* case, a jury found Samson liable for fraud and awarded the Hookses over $20 million in fraud damages—including about $13 million in late charges, calculated at a rate of 18% per annum, compounded monthly.[6] That award equaled an estimate by the Hookses' damages expert based on his reading of a provision identical to the Late Charge Provision. In the present case, the trial court found Samson liable for breach of contract and awarded the Bordages $12,955,919 in contract damages. That award is based on the same interpretation of the Late Charge Provision in *Hooks* and comprises mostly compound interest.

The Bordages argue that collateral estoppel prevents this Court from reaching the issue of whether the Late Charge Provision calls for simple or compound interest because that very issue was previously resolved in *Hooks*. Samson disagrees because the construction of the lease's text is an issue of law, and "[c]ourts disfavor applying collateral estoppel in the context of a pure question of law."[7]

An oil-and-gas lease is a contract, and its terms are interpreted as such.[8] The construction of an unambiguous contractual provision— meaning that the provision has only one reasonable construction—is an issue of law we review de novo using well-settled contract-construction principles.[9] A contract is not ambiguous merely because the parties

---

[6] 389 S.W.3d at 426.

[7] *Tankersley v. Durish*, 855 S.W.2d 241, 245 (Tex. App.—Austin 1993, writ denied).

[8] *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005).

[9] *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018).

4

disagree about its meaning.[10]

As discussed below, the Late Charge Provision's meaning is unambiguous because the only reasonable construction requires the late charge to be calculated using simple rather than compound interest. The provision's construction is therefore an issue of law.

This Court has spoken sparingly on the overlap between collateral estoppel and issues of law. But in *Getty Oil Co. v. Insurance Co. of North America*, we noted that collateral estoppel could apply to "essential issues of law that were litigated and determined in a prior action."[11] However, *Getty*'s application of collateral estoppel to issues of law is not limitless. The *Restatement (Second) of Judgments*, on which *Getty* relied to justify its statement, provides some exceptions— including some in the nonmutual context as is relevant here.[12]

Nonmutual collateral estoppel is implicated in two situations. First, when a nonparty to an earlier action seeks to prevent an opposing party from relitigating an issue that the opposing party litigated in the prior action.[13] Second, when a party to a prior action seeks to prevent a party in a later action who was a nonparty to the prior action from contesting an issue that was litigated in the prior action.[14]

---

[10] *Id.*

[11] 845 S.W.2d 794, 802 (Tex. 1992). However, collateral estoppel ultimately did not preclude our review in *Getty* because the precise issue of law had not been decided in the previous action. *Id.*

[12] RESTATEMENT (SECOND) OF JUDGMENTS § 28 (AM. L. INST. 1982).

[13] *See id.* § 29 cmt. b (citing *id.* § 28, illustrations 3, 4, 5, 7, 9, 10, & 11).

[14] *See id.*

5

Section 29 of the *Restatement* includes an exception that applies when treating an issue of law "as conclusively determined would inappropriately foreclose opportunity for obtaining reconsideration of the legal rule upon which it was based".[15] Comment i to Section 29 elaborates, noting that nonmutual collateral estoppel cannot foreclose a reviewing court from performing its function of developing the law.[16] That consideration is especially pertinent "when the issue is of general interest and has not been resolved by the highest appellate court that can resolve it."[17]

This Court, and Texas courts more broadly, have looked to the *Restatement* when interpreting the law of collateral estoppel.[18] Application of the *Restatement*'s highest-court exception makes particular sense for pure issues of law pending before this Court, whose mandate is to review issues of law important to the jurisprudence of this State.[19] We hold that nonmutual collateral estoppel will not prevent a party from relitigating an issue of law in this Court when we have not

---

[15] *Id.* § 29.

[16] *Id.* § 29 cmt. i.

[17] *Id.*

[18] *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 521-522 (Tex. 1998) (relying on Section 27 of the *Restatement* for the general rule prohibiting estoppel by alternative holdings); *Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796, 802 (Tex. 1994) (applying Section 29 of the *Restatement* to determine whether an issue was fully and fairly litigated in the prior action); *Tankersley*, 855 S.W.2d at 245 ("Texas state courts have cited various provisions under [S]ection 29 with approval when determining whether to apply collateral estoppel.").

[19] TEX. GOV'T CODE § 22.001(a).

previously decided the issue and we deem the issue important to the jurisprudence of the State.[20]

So, how does this rule apply here? First, we consider whether the interpretation of the Late Charge Provision is an issue previously decided by this Court. Our opinion in *Hooks* remanded to the court of appeals without construing the identical provision.[21] The appellate court issued a new opinion and judgment,[22] and we denied Samson's subsequent petition for review. While attempts to read into the tea leaves are perhaps unavoidable, we reiterate that our denial of a petition for review does not indicate our views on the merits of any particular issue.[23] Further, as the Bordages' counsel conceded at oral argument, this Court did not previously decide how to interpret the Late Charge

---

[20] We note that the analysis may differ in the context of *defensive* nonmutual collateral estoppel. One of the purposes underlying collateral estoppel—protecting parties from multiple lawsuits—does not apply with the same force in the present *offensive* context because the party subject to multiple suits *wants* to relitigate an issue. *See Sysco*, 890 S.W.2d at 801 ("The doctrine of collateral estoppel or issue preclusion is designed to promote judicial efficiency, protect parties from multiple lawsuits, and prevent inconsistent judgments by precluding the relitigation of issues."). By contrast, in the defensive context, a party subject to a judgment on an issue in a prior action wants to *avoid* relitigating that issue, and depending on the circumstances, collateral estoppel may be appropriate.

[21] 457 S.W.3d at 52.

[22] *Samson Lone Star L.P.*, 497 S.W.3d at 1.

[23] This Court denies petitions for review for a host of reasons, many of which have nothing to do with whether a lower court reached the right conclusions or reasoned correctly. *See* TEX. R. APP. P. 56.1(a). As a result, the denial of a petition for review provides no basis to conclude that this Court has previously decided an issue for collateral-estoppel purposes. *See id.* R. 56.1(b)(1).

Provision.

Second, we consider the importance of the underlying issues. At face value, this appeal is about the interpretation of a single provision in an oil-and-gas lease. But as described below, this case also involves two previously undecided issues important to the State's jurisprudence. Therefore, nonmutual[24] collateral estoppel does not apply.

**III**

We turn to two questions about the interpretation of the Late Charge Provision. First, whether Texas favors simple or compound interest in the absence of a written agreement on the applicable rate of interest. Second, whether the Late Charge Provision contains an express stipulation to a compound rate of interest.

We hold that the default rule in Texas is that simple interest applies in the absence of an express stipulation—with clear and specific language—to a compound rate of interest. We further hold that because the Late Charge Provision lacks clear and specific indicia of such an express stipulation, only simple interest is available.

**A**

In antiquity, the prohibition against usury went deeper than a surface-level distinction between simple and compound interest. The assessment of interest was outlawed altogether. From early

---

[24] The Bordages contend that they should be deemed parties to the *Hooks* case. First, because it was Samson, not they, who sought severance. Second, because the *Hooks* and *Bordages* cases have overlapping evidence, pleadings, and court orders. However, they cite no authorities in support of their position. Because the Bordages were severed from—and not subject to—the judgment in *Hooks*, we conclude that they are nonparties.

civilization's agrarian roots sprouted a principle that money, because of its sterility, "cannot beget money".[25] For thousands of years, with a few exceptions,[26] this principle unwaveringly held true.

During the medieval period, scholastics and natural-law philosophers laid the theoretical groundwork for legitimizing simple interest.[27] And between the late medieval period and renaissance,

[25] Jim Wishloff, *Usury and the Common Good*, 3 J. VINCENTIAN SOC. ACTION 13, 15 (2018) ("[M]oney was intended to be used in exchange, but not increase at interest . . . . [O]f all modes of getting wealth [usury] is the most unnatural." (quoting ARISTOTLE, POLITICS, Book I, Part 10 (4th cent. B.C.) (Barnes trans., 1984))); Robert P. Maloney, *The Teaching of the Fathers on Usury*, 27 VIGILAE CHRISTIANAE 241, 249 (1973) ("But you, copper and gold, things that cannot usually bring forth fruit, do not seek to have offspring." (quoting GREGORY OF NYSSA, CONTRA USURARIOS, PG 46,442 (4th cent. A.D.))). Some mistakenly believe that these principles are exclusively rooted in Jewish and Christian traditions. But similar prohibitions exist in Buddhist, Hindu, and Islamic legal traditions. Wishloff, *supra*, at 25.

[26] Solon, an archon of Athens, did not entirely eliminate interest. However, his debt-reform laws, known as *seisachtheia*, canceled public and private debts retroactively and eliminated debt slavery. Josine Blok & Julia Krul, *Debt and Its Aftermath: The Near Eastern Background to Solon's Seisachtheia*, 86 HESPERIA 607, 607-619 (2017). The Code of Hammurabi contemplated an interest rate set by the King, but Mesopotamia also attempted to control spiraling debt with "Clean Slate" proclamations. Michael Hudson, *How Interest Rates Were Set, 2500 BC–1000 AD: Máš, tokos, and fœnus as Metaphors for Interest Accruals*, 43 J. ECON. & SOC. HIST. OF THE ORIENT 132, 133 (2000). Caesar Augustus regulated lending for interest almost to extinction on the Italian peninsula, setting rates as low as 4%, which drove the lending market to other parts of the Roman Empire. Charles Bartlett, *The Financial Crisis, Then and Now: Ancient Rome and 2008 CE*, EPICENTER: HARV. UNIV. (Dec. 10, 2018), https://bit.ly/43OuWsI.

[27] Thomas Aquinas allowed for simple interest, provided it was not made in *direct* payment for a loan. This required interest to be assessed through legal fictions, like "extrinsic titles". André Lapidus, *Hugo Grotius on Usury: Acknowledging an End of the Scholastic Argument*, EUR. J. HIST. ECON. THOUGHT, hal-03989450, at 11 (Apr. 2023) (quoting THOMAS AQUINAS, SUMMA

mathematical advances led to a clearer conceptual separation between simple and compound interest.[28] With growing recognition of that distinction came the realization that different regulatory treatment may be appropriate. Thus, in time, Britain came to permit simple interest, but it imposed stringent penalties for usurious rates.[29]

**B**

Those principles eventually migrated to our shores. In the nineteenth century, the states were almost unanimous in permitting only simple interest. There was one exception: California. In seeking to advance a regime of absolute freedom of commerce, California had "no penalty for usury."[30]

THEOLOGIAE, IIa-IIae, Q. 78, art. 2, ad. 1 (1274)), https://bit.ly/3u0pZPM. Needless to say, there seems to be vanishingly little daylight between paying a lender interest directly and doing so indirectly to compensate him for risk and forgone opportunity. Thus, Hugo Grotius cast aside this apparent fig leaf, greatly simplifying the structure of personal and commercial loans. *Id.* at 18 (quoting HUGO GROTIUS, DE JURE BELLI AC PACIS, II, 12.21 (1625)).

[28] C.G. Lewin, *The Emergence of Compound Interest*, 24 BRIT. ACTUARIAL J. 1, 6 (2019) ("One of the earliest and most important sources for the study of simple and compound interest is the arithmetical manuscript written in 1202 by Leonardo Fibonacci of Pisa, known as *Liber Abaci*."); *id.* at 24 ("The earliest compound interest tables known to us are those included in Pegolotti's manuscript [on mercantile practice, *La Pratica della Mercatura*]; they may have originated around 1340."); *id.* ("With the notable exception of Fibonacci, it is not until the early 16[th] century that there is much evidence of serious thought being given to [compound interest].").

[29] In the eighteenth century, fifty years before the American Revolution, the Usury Act lowered rates to 5%. 12 Ann. c. 17, 13 Ann. c. 15. It imposed harsh penalties, including treble damages on principal, for excessive rates. J.F.B., *Usury*, XIII AM. L. REG. 321, 321-322 (1865).

[30] JFB, *supra* note 29, at 333. Michigan and Illinois provided for "greater rate[s]" "if specified in writing". *Id.* But even under written

10

That experiment, however, lasted less than a century. It ended in 1918 with the adoption of the California Usury Law by ballot initiative.[31] Thereafter, California harmonized its laws with those of the other states, acquiescing to the general rule that compound interest is prohibited absent a clear and specific expression to the contrary in writing.[32]

Around that time, the Supreme Court also had an opportunity to reconsider when compound interest is permitted. It chose to reinforce the general rule. In *Cherokee Nation v. United States*, the Court rejected a demand by the Cherokees for compound interest on four debts owed by the United States since 1819, the largest of which was a sum of $1.114 million.[33] The Solicitor General suggested that the Cherokees' demand for compound interest on that sum "for near a century" would result in an amount "equal to the national debt."[34]

While not mathematically precise,[35] the Solicitor's point about the

---

agreements to exceed Michigan's 7% ceiling, lenders could "only recover the principal and *simple interest*." *Id.* at 324 n.1 (emphasis added). Further, although Illinois' statutes were silent about whether interest was simple or compound, *id.* at 323-324 n.1, given the virtual unanimity on this issue, it is highly likely that Illinois permitted only simple interest.

[31] *Wishnev v. Nw. Mut. Life Ins. Co.*, 451 P.3d 777, 780-782 (Cal. 2019).

[32] *Id.* at 781.

[33] 270 U.S. 476, 477, 494 (1926).

[34] *Id.* at 492.

[35] The national debt in 1926 was $19.643 billion. *Historical Debt Outstanding*, FISCALDATA.TREASURY.GOV, https://bit.ly/4aUkyTa (last visited May 13, 2024). A compound rate of 5% with annual rests on $1.114 million for one century would have yielded a total of $146.492 million—132 times larger

inherent dangers of compound interest came through. Thus, the Supreme Court deemed that the language "shall bear interest at the rate of five per centum per annum, payable semiannually" is insufficient to authorize compounding.[36]

*Cherokee Nation*'s influence was felt beyond just contracts involving the United States. This was due to the Court's reliance on the "general rule" that "even as between private persons . . . in the absence of a contract therefor or some statute, compound interest is not allowed to be computed upon a debt."[37] *Cherokee Nation* cemented the disfavored status of compound interest and affirmed the propriety of longstanding

---

than the principal, but several multiples less than the national debt. *Compound Interest Calculator*, INVESTOR.GOV: U.S. SEC. & EXCH. COMM'N, https://bit.ly/3TUP49m (last visited May 13, 2024) (To reproduce, enter "1,114,000" in Initial Investment field; then enter "100" in Length of Time in Years field; then enter "5" in Estimated Interest Rate field; leave all other fields alone; then hit calculate). Even with semiannual rests, the total would have been $155.474 million. *Id.* (To reproduce, follow the above steps but select "semiannually" instead of "annually" in the Compounded Frequency field dropdown menu).

The Solicitor General's estimate of an amount equivalent to the national debt could have resulted only from a compound rate of 5% with annual rests for *two* centuries: $19.264 billion. These numerical inaccuracies do not undermine *Cherokee Nation*. They instead reinforce the notion that human beings are not naturally equipped to predict the behavior of large, complex systems. *See generally* NASSIM NICHOLAS TALEB, THE BLACK SWAN (Random House 2007). This underscores the wisdom of the ancient prohibition of, and today's presumption against, compound interest. Were the same dispute before the Supreme Court today, for instance, after three centuries of compounding, the $1.114 million principal would have ballooned to $2.533 trillion—an amount 2.3 million times greater than the original sum.

[36] *Cherokee Nation*, 270 U.S. at 481, 491-492.

[37] *Id.* at 490.

state law presumptions against its assessment.[38]

Today, compound interest remains disfavored. And where it is permitted, state laws echo *Cherokee Nation* in requiring clear and specific contractual or statutory authorization.[39] Even Delaware and

---

[38] *See, e.g.*, *HKB, Inc. v. Imperial Crane Servs.*, No. 1 CA-CV 20-0402, 2021 WL 2324931, at *3 (Ariz. Ct. App. June 8, 2021) (unpublished); *Landals v. George A. Rolfes Co.*, 454 N.W.2d 891, 896-897 (Iowa 1990); *Abbott v. Abbott*, 195 N.W.2d 204, 209 (Neb. 1972); *In re Schuster's Will*, 3 N.Y.S.2d 702, 704 (Sur. Ct. 1938); *Hensley v. W. Va. Dep't Health & Hum. Res.*, 508 S.E.2d 616, 624-625 (W. Va. 1998); *Bookworm, Inc. v. Tirado*, 44 V.I. 300, 307 n.5 (Terr. Ct. 2002).

[39] Alabama: *Burlington N.R.R. Co. v. Whitt*, 611 So. 2d 219, 223-224 (Ala. 1992); Alaska: *Brandal v. Shangin*, 36 P.3d 1188, 1193 & n.12 (Alaska 2001); Arizona: *Com. Realty Advisors, Ltd. v. Zink Invs. L.P.*, No. 1 CA-CV 16-0153, 2017 WL 2982109, at *3-4 (Ariz. Ct. App. July 13, 2017) (unpublished); *HKB*, 2021 WL 2324931, at *3; Arkansas: *Hartford Sch. Dist. No. 94 v. Com. Nat'l Bank*, 188 S.W.2d 638, 640-641 (Ark. 1945); California: *McConnell v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 662 P.2d 916, 920-921 (Cal. 1983); Colorado: *Tarabino Real Est. Co. v. Tarabino*, 126 P.2d 859, 862 (Colo. 1942); Connecticut: *Onthank v. Onthank*, No. FSTCV176034047S, 2020 WL 1488583, at *3 (Conn. Super. Ct. Jan. 30, 2020) (unpublished); *Perry v. Cohen*, 11 A.2d 804, 805-806 (Conn. 1940); District of Columbia: *D.C. Pub. Schs. v. D.C. Dep't Empl. Servs.*, 262 A.3d 213, 222-224 (D.C. 2021); Florida: *Cohen v. Jain*, 219 So. 3d 100, 100 (Fla. Dist. Ct. App. 2021) (per curiam); *Morgan v. Mortg. Disc. Co.*, 129 So. 589 (Fla. 1930); Georgia: *Caradigm USA LLC v. PruittHealth, Inc.*, 964 F.3d 1259, 1279-1280 (11th Cir. 2020) (citing *Noons v. Holiday Hosp. Franchising, Inc.*, 705 S.E.2d 166, 170 (Ga. Ct. App. 2010)); Hawaii: *Nawahi v. First Tr. Co. of Hilo, Ltd.*, 30 Haw. 359, 378-380 (1928); Idaho: *N. Idaho Bldg. Contractors Ass'n v. City of Hayden*, 432 P.3d 976, 990 (Idaho 2018); Illinois: *Weigel Broad. Co. v. Smith*, 682 N.E.2d 745, 752 (Ill. App. Ct. 1996); Indiana: *Wilson v. N. Salem Bank*, 171 N.E.3d 1066 (Table), 2021 WL 2521338, at *5 (Ind. Ct. App. June 21, 2021) (unpublished); *N. Ind. Pub. Serv. Co. v. Citizens Action Coal. of Ind., Inc.*, 548 N.E.2d 153, 161 (Ind. 1989); Iowa: *Iowa Sup. Ct. Bd. Prof'l Ethics & Conduct v. McKittrick*, 683 N.W.2d 554, 560-561 (Iowa 2004); Kansas: *Iola State Bank v. Bolan*, 679 P.2d 720, 735 (Kan. 1984); Louisiana: *Chittenden v. State Farm Mut. Auto Ins. Co.*, 788 So. 2d 1140, 1151 (La. 2001); Maine: *Premier Cap., Inc. v. Doucette*, 797 A.2d 32, 37 (Me. 2022); Maryland: *Travel Comm., Inc. v. Pan*

*Am. World Airways, Inc.*, 603 A.2d 1301, 1333-1334 (Md. Ct. Spec. App. 1992); Michigan: *Nation v. W.D.E. Elec. Co.*, 563 N.W.2d 233, 235-237 (Mich. 1997); Minnesota: *KPG Telecomms., LLC v. Ervin Cable Constr., LLC*, No. 20-CV-0114 (PJS/ECW), 2021 WL 4291105, at *7 (D. Minn. Sept. 21, 2021) (citing *Am. Druggists Ins. v. Thompson Lumber Co.*, 349 N.W.2d 569, 573 (Minn. Ct. App. 1984)); Mississippi: *Pursue Energy Corp. v. Abernathy*, 77 So. 3d 1094, 1102-1104 (Miss. 2011); Missouri: *Brockman v. Soltysiak*, 49 S.W.3d 740, 746 (Mo. Ct. App. 2001); *Penzel Constr. Co. v. Jackson R-2 Sch. Dist.*, 655 S.W.3d 434, 440-441 (Mo. Ct. App. 2022); Montana: *McCormick v. Brevig*, 169 P.3d 352, 360 (Mont. 2007); Nebraska: *Ashland State Bank v. Elkhorn Racquetball, Inc.*, 520 N.W.2d 189, 194-195 (Neb. 1994); Nevada: *Westgate Planet Hollywood Las Vegas, LLC v. Tutor-Saliba Corp.*, 449 P.3d 476 (Table), 2019 WL 4786884, at *4 (Nev. Sept. 27, 2019) (unpublished); New Hampshire: *Metro. Prop. & Liab. Ins. Co. v. Ralph*, 640 A.2d 763, 767 (N.H. 1994); New Jersey: *Henderson v. Camden Cnty. Mun. Util. Auth.*, 826 A.2d 615, 619-620 (N.J. 2003); New Mexico: *State ex rel. King v. B & B Inv. Grp., Inc.*, 329 P.3d 658, 675-676 (N.M. 2014); New York: *R.F. Schiffman Assocs. v. Baker & Daniels LLP*, 147 A.D.3d 482, 483 (N.Y. App. Div. 2017); North Carolina: *Ferguson v. Coffey*, 637 S.E.2d 241, 243 (N.C. Ct. App. 2006); North Dakota: *Van Sickle v. Hallmark & Assocs.*, 840 N.W.2d 92, 108 (N.D. 2013); Ohio: *Mayer v. Medancic*, 919 N.E.2d 721, 724-725 (Ohio 2009); Oklahoma: *Phillips v. Hedges*, 124 P.3d 227, 231 (Okla. 2005); Oregon: *In re Marriage of Mannix*, 932 P.2d 70, 73-74 (Or. Ct. App. 1997) (en banc) (discussing OR. REV. STAT. § 82.010(2)(c)); Pennsylvania: *Penn. State Educ. Ass'n v. Appalachia Intermediate Unit 08*, 476 A.2d 360, 363 (Pa. 1984); *In re Est. of Dembosky*, 301 A.3d 906 (Table), 2023 WL 4013364, at *2 (Pa. Super. Ct. June 15, 2023) (unpublished); Rhode Island: *Imperial Cas. & Indem. Co. v. Bellini*, 947 A.2d 886, 894-895 (R.I. 2008); South Carolina: *Edwards v. Campbell*, 633 S.E.2d 514, 516-517 (S.C. 2006); South Dakota: S.D. CODIFIED LAWS §§ 51A-12-15, 54-3-1.1, 54-3-4, 54-3-16; Tennessee: *In re Est. of Hawkins*, No. W2003-02279-COA-R3-CV, 2004 WL 2951993, at *10-11 (Tenn. Ct. App. Dec. 16, 2004, appeal denied); Utah: *City of Hildale v. Cooke*, 28 P.3d 697, 708 (Utah 2001); Vermont: *Greenmoss Builders, Inc. v. Dun & Bradstreet, Inc.*, 543 A.2d 1320, 1323-1324 (Vt. 1988); Virginia: *Helena Agri-Enters., LLC v. VA7, LLC*, No. 5:22-cv-00015, 2022 WL 2287417, at *4 (W.D. Va. June 23, 2022) (citing VA. CODE ANN. § 6.2-302); Washington: *Sintra, Inc. v. City of Seattle*, 935 P.2d 555, 565-566 (Wash. 1997); *id.* at 586 n.17 (concurrence); West Virginia: *Warrior Oil & Gas, LLC v. Blue Land Servs., LLC*, 886 S.E.2d 336, 345 (W. Va. 2023); Wisconsin: *McFadden v. Gray*, 508 N.W.2d 75 (Table), 1993 WL 348678, at *1 (Wis. Ct. App. Sept. 8, 1993) (unpublished); Guam: *Guam United Warehouse Corp. v. DeWitt Transp. Servs. of Guam*, 2003 Guam 20

14

Massachusetts law, upon which the Bordages rely so heavily, are consistent with the general rule.[40] And the few exceptions to the general rule—some of which are unique to other jurisdictions—are inapplicable here.[41] Thus, the Bordages' arguments in favor of compound interest find little support.[42]

---

¶¶ 36-39 (2003); Virgin Islands: *Castor v. Andrews*, No. ST-94-CV-408, 2009 WL 10742644, at *1 (V.I. Super. Ct. July 2, 2009); *Smith v. Companion Assurance Co.*, 70 V.I. 233, 239-240 (Super. Ct. 2019).

[40] The Delaware Court of Chancery retains the discretion to award compound interest in "specific circumstances", but compounding remains a disfavored "exception", and Delaware courts have rejected as false claims of "recent trend[s]" in its favor. *LCT Cap., LLC v. NGL Energy Partners LP*, No. N15-C-08-109 JJC CCLD, 2023 WL 4102666, at *7-8 (Del. Super. Ct. June 20, 2023) (collecting cases); *see also Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 173 (Del. 2002). Massachusetts likewise permits compounding "in certain cases" but reaffirms its "ancient unwillingness to allow compound interest". *Sec'y of Admin. & Fin. v. Lab. Rels. Comm'n*, 749 N.E.2d 137, 143 (Mass. 2001). Thus, while compound interest is permitted in "equitable proceeding[s]", it remains "generally disfavored". *Lombardi Corp. v. Urb. Improvement Fund Ltd. 1973*, Nos. 143922BLS1, 150643BLS1, 2016 WL 3919624, at *11 (Mass. Super. Ct. May 20, 2016).

[41] One such exception arises in takings cases, where compound interest may be assessed under the Fifth Amendment's "just compensation" requirement. *Innovair Aviation, Ltd. v. United States*, 83 Fed. Cl. 498, 506-507 (2008). Another exception, already discussed, *supra* note 40, permits courts of equity to assess compound interest in some circumstances. A third, also equitable in origin, permits compounding in certain cases involving breaches of fiduciary duty and mismanagement of trust assets. *Jo Ann Howard & Assocs. v. Cassity*, 395 F. Supp. 3d 1022, 1193 (E.D. Mo. 2019), *aff'd sub nom. Jo Ann Howard & Assocs. v. Nat'l City Bank*, 11 F.4th 876 (8th Cir. 2021). One more exception, accepted in Texas, applies to the assessment of postjudgment interest. TEX. FIN. CODE § 304.006.

[42] Few cases support the Bordages' position, and those that do rest on questionable reasoning. *See, e.g.*, *Halling v. Yovanovich*, 391 P.3d 611, 620-621 (Wyo. 2017) (holding that the trial court did not clearly err by concluding that "accrue @ 6% monthly" means "6 percent annual interest compounded

## C

The same principles hold true in Texas. From our earliest jurisprudence, the default rule has been that simple interest applies unless parties "expressly stipulate" to compound interest.[43] While early Texas cases properly invoked the general rule, our decision in *Lewis v. Paschal's Administrator* sowed confusion by suggesting that the use of any temporal language—such as "per annum" or "annually"—could suffice for such an express stipulation.[44] The problem is that similar and identical temporal language appears in interest clauses for a wide variety of reasons. To provide but one example, *simple* interest is often

---

monthly"); *Dec. Farm Int'l, LLC v. Dec. Est., LLC*, Nos. 2019-CA-0983-MR, 2019-CA-1057-MR, 2021 WL 1823278, at *13 (Ky. Ct. App. May 7, 2021, review denied) (holding that the trial court did not abuse its discretion by concluding that "accrue interest at the rate of twelve percent (12%) per annum" "plainly refer[s] to compounding interest"); *but see Nucor Corp. v. Gen. Elec. Co.*, 812 S.W.2d 136, 140 n.1 (Ky. 1991) (noting that "compound interest [is] inappropriate [in actions at law] even if interest [is] otherwise proper").

[43] *Lewis v. Paschal's Adm'r*, 37 Tex. 315, 320 (1872); *Andrews v. Hoxie*, 5 Tex. 171, 194 (1849) (stating that "an *agreement* to pay interest on interest [i.e., compound interest] is not usurious") (emphasis added).

[44] *See* 37 Tex. at 318, 320 (concluding that "ten per cent. per annum, payable annually" is a stipulation to compound interest); *see also Roane v. Ross*, 19 S.W. 339, 340 (Tex. 1892) (affirming that "interest at the rate of 10 per cent. per annum from date . . . [payable] annually" is a stipulation to compound interest); *Texon Energy Corp. v. Dow Chem. Co.*, 733 S.W.2d 328, 331 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.) (concluding that "interest monthly at the rate of twelve percent (12%) per annum" is a stipulation to compound interest). The court below appeared to follow this line of cases. *See* 662 S.W.3d at 509-510 (concluding that an agreement to pay interest on "past due royalties . . . based on the amount due and calculated at the maximum rate allowed by law" where interest was "due and payable on the last day of each month" is a stipulation to compound interest).

16

described using "per annum" or "per month" language.[45]

*Paschal's Administrator* was built on sand.[46] It is thus unsurprising that its legacy has toppled. Even if pre-*Cherokee Nation* cases in Texas permitted compounding under such an illusory standard, we have long since reversed course.[47] *Paschal's Administrator* and its

---

[45] *See*, *e.g.*, *KPG Telecomms.*, 2021 WL 4291105, at *7 (explaining the sensibility of a "specificity" requirement: if "contractual language as simple as 'per month' were sufficient to trigger compound interest, then [the law] would be turned on its head . . . [c]ompound interest would be the rule, rather than the exception . . . as almost every interest clause imposes interest on a 'per year,' 'per month,' 'per week,' or 'per day' basis").

[46] *Paschal's Administrator* rests on obiter dicta—so defined by the very author of the opinion—in *De Cordova v. City of Galveston*, 4 Tex. 470 (1849). One of the questions presented in *De Cordova* was: "Where interest is payable annually[,] . . . whether the creditor is entitled to interest upon interest"? *Id.* at 470. At the start of his opinion, Chief Justice Hemphill expressly declined to address that issue, explaining that the "only question deemed material to discuss" was the "statute of limitations". *Id.* at 473. But *Paschal's Administrator* unduly focused on one of Chief Justice Hemphill's passing hypotheticals, where he simply observed that "[t]he interest might have, perhaps, been recovered in a separate suit; or, if the action had been brought before the bar of the statute, the plaintiffs would have been entitled to annual rests, and to interest upon the interest in computing the amount to be recovered." *Id.* at 482. *Paschal's Administrator* declined to treat that statement as dicta—despite Chief Justice Hemphill's cautionary words—and insisted that "*it can hardly be questioned* that [Chief Justice Hemphill] intended to decide that interest upon interest might be recovered". 37 Tex. at 319 (emphasis added).

[47] *Bothwell v. Farmers' & Merchants' State Bank & Trust Co. of Rusk* was decided four years after *Cherokee Nation* but did not consider that opinion, even though it ultimately concluded that the notes at issue were usurious. 30 S.W.2d 289, 292 (Tex. 1930). We expressed doubt about "the toleration of taking interest in advance at the highest rate allowed by law," an "artificial rule . . . unsupported by any sound reasoning". *Id.* (quoting *First Nat'l Bank v. Davis*, 108 Ill. 633, 638 (1884)); *see id.* at 291 (explaining that the note in *Davis* could not "be differentiated from that one before us"). In this way, Texas had

17

progeny have not been cited or followed for almost a century. Instead, more recently, the majority of Texas courts that have squarely considered this issue have reoriented to the general rule.[48]

As *Cherokee Nation* illustrates, the choice between simple and compound interest can have drastic consequences.[49] Accordingly, a court's application of compound interest to a contract where compound interest was never intended can easily transform a venture that was beneficial to both sides into an oppressive relationship. In defiance of an extensive legal tradition, *Paschal's Administrator* allowed choices of such gravity to be made with little more than a judicial coin flip, reaffirming the wisdom of the principle that one should not remove a

___

already begun arcing back towards the general rule even before *Cherokee Nation*'s effects were felt. And to be clear, *Bothwell*'s suggestion that compound interest may not require "any express stipulation" does not survive *Cherokee Nation* or the present case.

[48] *See In re Phillips*, 496 S.W.3d 769, 776 & n.36 (Tex. 2016); *City of Austin v. Foster*, 623 S.W.2d 672, 675-676 (Tex. App.—Austin 1981, writ ref'd n.r.e.); *Spiller v. Spiller*, 901 S.W.2d 553, 558-559 (Tex. App.—San Antonio 1995, writ denied); *William C. Dear & Assocs. v. Plastronics, Inc.*, 913 S.W.2d 251, 254 (Tex. App.—Amarillo 1996, writ denied). *See also Ex parte Glover*, 701 S.W.2d 639, 640 (Tex. 1985) (holding that a directive for "interest at the rate of 10% per annum" provides insufficiently "clear and definite" guidance on whether simple or compound interest is contemplated). *Glover* did suggest in passing that "per annum" could mean "compound interest as easily as simple interest." *Id.* But that dictum contradicts *Cherokee Nation*, a pre-*Erie* case that invokes "general" principles of law. 270 U.S. at 490; *see Swift v. Tyson*, 41 U.S. 1, 12-15 (1842). And regardless, *Glover* is a clear departure from *Paschal's Administrator*'s pronouncement that "there can be no reasonable doubt" that "per annum" or "annually" requires the assessment of compound interest. 37 Tex. at 318-320.

[49] *See supra* note 35.

fence until one understands why it was put there.[50]

Today, we disapprove *Paschal's Administrator* and its progeny to the extent that they are inconsistent with the following statement. The default rule in Texas accords with the general rule: absent clear and specific contractual or statutory authorization, compound interest[51] is prohibited, and only simple interest[52] is available.

**D**

The final question we must consider is what degree of clarity and specificity is required to expressly stipulate to a compound rate of interest. While we do not prescribe any particular formulas or magic words, we can certainly say what language falls short. In light of the harsh, commercially oppressive nature of compound interest, clauses

---

[50] *City of League City v. Jimmy Changas, Inc.*, 670 S.W.3d 494, 512 (Tex. 2023) (Young, J., concurring) (invoking the principle commonly known as "Chesterton's fence"); G.K. CHESTERTON, THE THING 29 (Sheed & Ward 1946).

[51] In plainer but less precise language, "compound interest" is "[i]nterest paid on both the principal and the previously accumulated interest". *In re TCI Courtyard, Inc.*, 591 F. App'x 256, 257 (5th Cir. 2015) (quoting *Compound interest*, BLACK'S LAW DICTIONARY (10th ed. 2014)). "[A]t the end of each interest period, the accrued interest is added to the principal for purposes of future calculations of interest." *Themis Cap., LLC v. Dem. Rep. Congo*, 626 F. App'x 346, 349 (2d Cir. 2015) (citation omitted). To use more precise terms, compound interest is expressed formulaically as $CI = P(1 + r/n)^{nT} - P$; where CI is compound interest, P is the principal, r is the annual interest rate, n is the number of compounding periods, and T is the time or term. For example, a borrower who borrows $100 at an interest rate of 6% per annum (0.06) for 100 years, compounded monthly (12), will owe $39,644.23 in compound interest; $CI = \$100(1 + 0.06/12)^{(12)(100)} - \$100$.

[52] Simple interest (SI) is calculated by multiplying the principal (P), by the annual interest rate (r), and the time or term (T); $SI = PrT$. For example, a borrower who borrows $100 at an interest rate of 6% per annum (0.06) for 100 years will owe $600 in simple interest.

19

imposing interest must be strictly construed in favor of simple interest.[53]

The court of appeals relied heavily on the Late Charge Provision's statement that interest becomes "due and payable on the last day of each month" (or stated differently, "due and payable [monthly]"). The Supreme Court deemed similar language insufficient in *Cherokee Nation*.[54] It should have been clear that such language falls short.

As a general matter, mere temporal references (e.g., "per annum," or "annually") standing alone are insufficient to sustain the assessment of compound interest.[55] Almost every interest clause imposes interest on a "per annum" or "per month" basis.[56] And the most standard reading of a clause that demands payment "monthly" or "annually" is that it merely specifies the time for payment.[57] Further, while periodic rests are indeed

---

[53] *See Cherokee Nation*, 270 U.S. at 490 ("In view of the care with which [legal tradition] ha[s] limited the collection of simple interest . . . a fortiori must compound interest be denied[,] unless [express] provision therefor is made".); *Spiller*, 901 S.W.2d at 558-559 (holding that a statute "silent as to whether the interest was simple or compounded" requires simple interest "as a matter of law").

[54] 270 U.S. at 491-492 (concluding that the phrase "payable semiannually" is insufficient to trigger compound interest with semiannual rests).

[55] *Phillips*, 496 S.W.3d at 776 (expressing doubt about an "argu[ment] that . . . interest compounds" when a statute uses only the term "per annum"); *Foster*, 623 S.W.2d at 675 (explaining that merely "prescrib[ing] legal interest in terms of an annual rate" does not "direct" the compounding of interest); *id.* at 676 (citing *Cherokee Nation*, 270 U.S. at 476).

[56] *See, e.g.*, *KPG Telecomms.*, 2021 WL 4291105, at *7-8.

[57] *Cherokee Nation*, 270 U.S. at 491-492 (concluding that "shall be paid semiannually" is insufficient to authorize compound interest).

a feature of agreements to compound rates of interest,[58] courts will not impose the harsh penalty of a compound rate by gleaning such periodic rests from ordinary or ambiguous temporal language that could also refer to a simple rate of interest.[59]

The court of appeals also reasoned that because the last sentence of the Late Charge Provision states that interest is "due and payable . . . each month", any unpaid interest must be blended "every month" with the "amount" of past due monthly royalties subject to late charges in the first sentence of the provision. It thus concluded that the contract contemplated late charges on late charges, or interest on interest. But courts are called to interpret a contract's plain language.

Here, a plain reading of the Late Charge Provision shows that it calls only for simple interest. It provides for a late charge "based on the amount due" of "past due royalties . . . including any compensatory royalties". The late charge begins to accrue interest at the "maximum rate allowed by law"—a simple interest rate, absent an express stipulation, with clear and specific language, to the contrary—on the day after "such monthly royalty payment" was due. The late charge must be paid, i.e., becomes "due and payable", on the last day of the month in

---

[58] Periodic rests denote the frequency with which compounding will occur. *See Yaws v. Jones*, 19 S.W. 443, 446 (Tex. 1892) ("The note sued upon expressly provides that 'in case of failure to pay the note at maturity the interest is to be added to the principal, and total to draw interest, with annual rests.'").

[59] To be clear, however, an agreement that expressly provides a time period for compounding, together with the word "compounded" (e.g., "compounded annually" or "compounded semiannually"), at a given rate of x%, is sufficiently clear to denote compound interest.

which it is assessed. If the due date is missed, simple interest continues to accrue on the unpaid royalty "for every calendar month and/or fraction thereof from the due date until paid".

The court of appeals rejected this straightforward approach because it thought such a reading would render the Late Charge Provision's final sentence meaningless. Not so. The parties' agreement that any late charges become "due and payable" on a certain day achieves at least two things. First, it provides predictability about when the Bordages could expect late charges to be paid. Second, it creates a fixed point from which the Bordages could assess the maturation of their legal rights to collect any unpaid late charges and to seek other contractual remedies.

We hold that the language of the Late Charge Provision is insufficiently clear and specific to constitute an express stipulation to compound interest. Thus, only simple interest is available, and the trial court's assessment of compound interest against Samson was in error.

\* \* \* \* \*

We reverse the court of appeals' judgment and remand the case to the trial court for further proceedings consistent with this opinion.

Nathan L. Hecht
Chief Justice

**OPINION DELIVERED:** June 7, 2024

22